**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re<br><br>**ROMAN CATHOLIC BISHOP OF GREAT FALLS, MONTANA, A MONTANA RELIGIOUS CORPORATE SOLE (Diocese of Great Falls)**,<br><br>Debtor. | Case No. **17-60271-11** |

# MEMORANDUM of DECISION

*Introduction*

In this chapter 11[1] case, on November 2, 2017, the Official Committee of Unsecured Creditors (" the Committee") filed a motion seeking "exclusive and irrevocable" authority to commence, prosecute, and settle adversary proceedings under Bankruptcy Code §§ 544, 547, 548, 549 and 550 ("Avoidance Actions") against the parishes ("Parishes") and other affiliates of the Debtor-in-Possession, the Roman Catholic Bishop of Great Falls, a Montana Religious Corporate Sole ("the Diocese"). Dkt. No. 220. The sole response to the Committee's Motion was filed by the Diocese, and its objection was a limited one. Dkt. No. 230. On January 4, 2018, the Court conducted a hearing concerning the Committee's Motion, at which the parties appeared and presented arguments. Dkt. No. 42. After due deliberation, this Memorandum

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure, Rules 1–86.

1

disposes of the Committee's Motion.[2]

*Background*

The Diocese is a corporation sole organized under Montana's corporation laws. *See* Mont. Code Ann. § 35-3-101 *et. seq*. Over 100 Parishes, and at least one school, are affiliated with the Diocese. The parties agree that, under applicable civil law, these affiliates are not separate legal entities. The Committee is comprised and represents the interests of the many claimants in this case alleging that they suffered sexual and other abuse at the hands of the various agents of the Diocese.

When the Diocese filed a Chapter 11 bankruptcy petition, in its schedules, it listed an interest in various assets, including approximately $70,000,000 in real estate and $19,000,000 in checking and investment accounts. The Diocese contends that these valuable assets are either held in trust or otherwise for the benefit of the Parishes, or that the assets have been transferred to and are held by third parties. The Diocese explains in its schedules that the Debtor is incorporated under Montana law as the "Roman Catholic Bishop of Great Falls, Montana, a Montana religious corporation sole," but that under the Code of Canon Law of the Roman Catholic Church, each of its affiliates (*e.g.*, each of the Parishes) constitutes a separate and distinct entity within the Church. According to this view, while the Diocese may hold legal title to the properties, it does so solely for the benefit of the affiliates.

In its Motion, the Committee seeks authorization to commence, prosecute and, if appropriate, settle litigation, on behalf of the Diocese and bankruptcy estate against the Parishes

---

[2] This Memorandum constitutes the Court's findings of material fact and conclusions of law. Rules 7052; 9014.

and others asserting the statutory trustee avoiding powers granted to a chapter 11 debtor by §§ 544, 547, 548, 549 and 550. *See* § 1108(a) (granting a chapter 11 debtor, with some exceptions, all the rights and powers of a trustee). In particular, invoking the avoiding powers, the Committee seeks: (1) to set aside an alleged transfer by the Diocese of over $16 million in financial assets and cash from the so-called Deposit and Loan Fund ("DLF") to another entity known as the Capital Assets Support Corporation ("CASC"); and (2) a determination that the real property listed in the Diocese's schedules as being held in trust for the Parishes is property of the Bankruptcy Estate, and that all unrecorded interests in that real property may be avoided.[3] In its draft complaint submitted with its Motion, the Committee proposed to sue the CASC and all of the Parishes.

The Diocese filed a Limited Objection to the Committee's Motion representing that, while it does not oppose the Committee's request to prosecute the Avoidance Actions, the Diocese should be allowed to participate in and contest those actions when filed. The Diocese also contended that the Committee's prosecution of such actions should be subject to certain limitations or "controls". In support of its position, the Diocese steadfastly maintained that the Parishes are the true owners of the real property, and that they own the funds in their bank

---

[3] Separate and distinct from its argument that the Parishes' unrecorded interests in the real property may be avoided, the Committee also contends that, because the Parishes are not separate legal entities, under applicable law, they can not hold title to real property or be beneficiaries of a trust. Prior to the hearing on the present Motion, on December 18, 2017, the Committee also commenced a Declaratory Judgment Action against the Diocese involving the parties' respective rights and interests in many of the same properties that will be the subject of the Avoiding Actions. *See* § 1109(b) (granting, among others, a creditors' committee the right to "raise . . . and be heard on any issue in a case."). The Diocese answered that complaint on January 18, 2018; the Parishes filed an answer to the complaint on February 9, 2018; and the Committee recently filed a motion for summary judgment in that adversary proceeding.

accounts and in the DLF. According to the Diocese, under the principles of Canon Law, the real and other property titled in its is name is simply held in trust for the Parishes. The Diocese characterized the Committee's proposed complaint as a "shotgun" approach to litigation, the cost of which will consume its scarce assets. To protect the parties' time and resources, the Diocese argued that the Committee's "blanket complaint" is not appropriate, and that the Parishes and the CASC should be sued individually; that any claims asserted by the Committee should remain property of the bankruptcy estate subject to the control of the Diocese; that the Committee should not be authorized to pursue any claim, transfer or claim for relief not specifically identified in the proposed complaint; and that the Court must take a proactive role in the litigation, weeding out unnecessary claims and requiring the Committee to conform to a litigation budget.

In response to the Diocese's concerns, the Committee agreed at the January 4, 2018, hearing to bifurcate its litigation and to limit the named defendants to the Diocese, the CASC and fourteen representative Parishes. The Committee also agreed that any property recovered via the Avoiding Actions would remain property of the bankruptcy estate, that, despite the Avoiding Actions, the Diocese could settle the issues raised in the litigation through the confirmation process in a chapter 11 plan, and that it was fair and appropriate to require the Committee to seek Court approval before adding any additional claims or defendants to the litigation. In addition, the Committee acknowledged that it would be unfair to starve the Parishes of the funds to pay for their defense of the Avoiding Actions by blocking their access to the DLF through the litigation. The Committee, however, clarified that it would resist any attempts to compensate Parish counsel from any other assets of the bankruptcy estate.

At the conclusion of the hearing, the Court granted the parties time to file post-hearing memoranda addressing the Committee's revised proposals, which the parties have done. Dkt. Nos. 273 and 298. The Court also directed the Committee to submit its proposed revised complaint to comport with the representations made by the Committee's counsel at the hearing. The Committee did so, Dkt. No. 273, p.4-21, and in its new submissions, it now proposes to file two complaints, one against the Diocese and CASC targeting the approximately $16 million of financial assets transferred from the DLF to the CASC prior to the bankruptcy filing, and a second complaint against the Diocese, Billings Catholic Schools[4] and 14 representative Parishes challenging their interests in the real estate.

*Analysis and Disposition*

Having considered the parties' submissions and arguments, and the record in this case, the Court has determined that the Committee's Motion should be granted. Because determination of the extent of the assets in the bankruptcy case is a critical condition to confirmation of a plan, and since the Diocese is unwilling to assert its avoiding powers against its affiliates, the Committee's request to pursue that litigation is necessary and appropriate.

The Bankruptcy Code clothes a bankruptcy trustee with special powers to "avoid", or undo, certain voluntary or involuntary transfers made by a debtor to others, in some situations, even several years before a bankruptcy case is commenced. In a Chapter 11 case, unless a trustee has been appointed, the debtor-in-possession exercises the avoiding powers. § 1107(a). If a debtor-in-possession or trustee unjustifiably refuses to prosecute avoidance actions, the

---

[4] Billings Catholic Schools had not been named as a defendant in the original draft proposed complaint submitted with the Committee's Motion.

creditors' committee in the chapter 11 case may, with approval of the bankruptcy court, be granted derivative standing to pursue them. *In re Valley Park, Inc.*, 217 B.R. 864, 866 (Bankr. D.Mont. 1998).

This Court has previously endorsed the wisdom of granting derivative standing to a chapter 11 creditors' committee to pursue actions on behalf of the bankruptcy estate when the debtor was unwilling to do so. *See In re Valley Park*, 217 at 866 (quoting *Liberty Mutual Ins. Co. v. Official Unsecured Creditors Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.)*, 207 B.R. 899, 903 (9th Cir. BAP 1997)) ("in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation). In determining whether to confer derivative standing to assert avoiding powers on a creditors' committee, this Court considers the four factors often identified by courts:

1. Whether a demand has been made upon the statutorily-authorized party to take action;

2. Whether the demand is declined;

3. Whether a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and

4. Whether the inaction is justified in light of the debtor-in-possession's duties in a chapter 11 case.

*In re Yellowstone Mountain Club, LLC*, 2009 WL 982207 *6 (Bankr. D.Mont. 2009) (citing, *Valley Park*, 217 B.R. at 866).

As noted earlier, here, the Diocese's objection to the Committee's Motion is limited. In particular, the Diocese does not dispute that factors 1 and 2 are, with the exception of Billings Catholic Schools, satisfied as to all of the proposed defendants named in the Committee's modified complaints. The Diocese effectively concedes that the Committee asked it to pursue

6

avoidance actions against CASC and the Parishes, and that is has declined to do so.[5]

The Diocese also acknowledges that it holds legal title to an extensive amount of real property and to monies in various deposit and investment accounts. It argues that most of the real property and funds, under consistently-applied principles of Canon Law, are held in trust on behalf of the Parishes. But while the Diocese contends it holds the property in trust for the Parishes, the Diocese does not dispute that the Committee's claims challenging the affiliates' interests are indeed colorable, *i.e.*, that they could surely survive a motion to dismiss. *See, e.g., In re Archdiocese of Milwaukee*, 483 B.R. 855, 858-59 (Bankr. E.D.Wis. 2012).

However, the Diocese argued that the cost of defending the Committee's original proposed complaint outweighed the benefits to the bankruptcy estate the action may achieve in many instances. The Committee apparently sought to accommodate this argument by revising its original complaint and now proposing that it commence two actions, one against the Diocese and CASC, and a second that targets the Diocese, Billings Catholic Schools and 14 representative Parishes as defendants.[6] Despite this, the Diocese maintains that the Court should

---

[5] The Diocese disputes that the Committee made a demand for it to pursue any action against Billings Catholic Schools. The Diocese contends that Billings Catholic Schools owns the real property on which a new school was constructed, but that the improvements on the real property, including the newly constructed school, are owned by the Billings Catholic Schools Foundation, which has a 75-year lease on the real property. To the Court, under these facts, the omission of Billings Catholic Schools and the Foundation from the Committee's initial demand is, at worst, a harmless oversight. The Court has no doubt that the Diocese would have declined to pursue avoidance claims against these affiliates had it been asked to do so.

[6] The Committee contends that the Parishes are not separate legal entities or persons and that they have no separate legal existence from the Diocese. While not specifically addressed by the parties, the Committee's position raises the question of whether the Parishes may be sued. Under Civil Rule 17(b)(3), the capacity of an unincorporated association to sue or be sued is determined by the law of the state where the subject court is located, "except that . . . [an] unincorporated association with no capacity under that state's laws may sue or be sued in its

exercise judicial oversight over the Committee's litigation expenses.

The litigation proposed by the Committee will no doubt be expensive. However, the amounts in controversy, and the potential recovery for creditors of the asset from the disputed real property and cash is truly significant, and would undoubtedly enhance the creditors' position in this case. Moreover, determining the extent of property of the bankruptcy estate is an important step in allowing the parties to propose and evaluate any chapter 11 plan.[7] Therefore, if the Avoiding Actions are successful, the creditors will enjoy substantial benefits.

Though prosecution of the Avoiding Actions will come at a substantial cost to the bankruptcy estate, the Court is not inclined to impose a litigation budget on the Committee. The Court has an independent obligation to review the fee applications of counsel for both the Diocese and the Committee and to evaluate the propriety and reasonableness of payment of any

---

common name to enforce a substantive right existing under the United States Constitution or laws . . . ." Under Montana law, an "unincorporated association" is "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." *MacPheat v. Schauf,* 2002 MT 23, ¶ 14, 308 Mont. 215, 219, 41 P.3d 895, 897 (citing *Associated Press v. Senate Republican Caucus*, 286 Mont. 172, 179, 951 P.2d 65, 69 (1997)). The word "person" as defined in Rule 4A of the Montana Rules of Civil Procedure and includes "an unincorporated association; and any two or more persons having a joint or common interest or any other legal or commercial entity." *Id*. at ¶ 13, 308 Mont. at 219, 41 P.3d at 897. It therefore appears that the Parishes are "persons" under applicable state law. Even were that not the case, the Civil Rule exception would also likely apply, since the Committee's Avoiding Actions seek to enforce substantive rights (*i.e.,* avoiding powers) granted under the Bankruptcy Code.

[7] The Court also believes that prosecution of the Avoiding Actions may have a therapeutic effect on the parties' attitudes about the desirability of a negotiated resolution to the issues raised in this case, and perhaps motivate them to consider a consensual plan. Thus far, the parties have been unsuccessful in achieving any consensus on the appropriate outcome in this case. In the absence of a settlement, the Court believes litigation is the only means to clarify the parties' respective interests in the case, albeit an expensive, less desirable approach when compared to a compromise.

compensation requested from the assets of the bankruptcy estate. *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 841 (3rd Cir. 1994); *In re Evans*, 153 B.R. 960, 968 (Bankr. E.D. Pa 1993). In doing so, fee applicants must provide the Court with an adequate summary of services performed and costs incurred and "[t]he applicant must demonstrate . . . that the services were 'reasonably likely' to benefit the estate at the time the services were rendered." *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Company, (In re Mednet)*, 251 B.R. 103, 108 (9th Cir. BAP 2000). The Court is confident that its oversight in this fee process will insure that scarce estate resources are not being needlessly expended by the parties in the Avoiding Actions.[8] The Court therefore concludes that factor 3 of the analysis for conferring derivative standing on the Committee to pursue the Avoiding Actions is also satisfied.

Finally, concerning factor 4, the Diocese has not admitted that it abused its discretion as a debtor-in-possession in any way by not pursuing the affiliates via avoidance actions because, in its view, the Parishes and others are the true owners of the real property and other assets, and that the Avoiding Actions therefore lack merit. However, as noted above, the Diocese's objection is limited, and the Diocese does not attack the Committee's Motion on this basis.

---

[8] Neither the Diocese nor the Committee address the issue of whether it is proper for the Diocese to be named as a defendant in a § 544(a) avoidance action concerning the real property. While this question is perhaps academic, since the Committee's proposed complaint indeed names the Diocese as a defendant, the Court could be concerned over whether assets of the bankruptcy estate should be used to fund both prosecution and defense of the same action. While the other defendants in the Avoiding Actions will surely be represented by separate counsel, the Diocese and its attorneys seem anxious to defend against the Committee's claims. But it seems strange that the Diocese, as a chapter 11 debtor-in-possession, acts consistent with its fiduciary duties by compensating its lawyers to argue against the interests of the creditors. Because the issue is not before it at this time, the Court expresses no opinions whether a sufficient benefit will be conferred upon the bankruptcy estate to allow counsel for the Diocese to be paid for its efforts in this litigation.

Regardless, however, on this record, the Court would conclude that the Diocese's decision to forego a challenge to the interests held by the Parishes and others in the valuable real estate assets and financial accounts is inconsistent with its fiduciary duties as a chapter 11 debtor-in-possession. This factor is also satisfied.

While not critical to the Court's analysis, the Committee has agreed that it would be unfair to starve the Parishes of cash to defend the Avoiding Actions. As explained by the Committee's counsel, if the Parishes are following Diocesan policy, they are regularly depositing their cash in the DLF. Without conceding the merits of their position about the parties' rights in the funds, the Committee acknowledged that the Parishes should be able to use the money they have deposited in the DLF to pay their attorneys to defend their interests in the Avoiding Actions. However, the Committee would resist allowing the Parishes to use other property that is property of the Bankruptcy Estate to pay their legal bills. To the Court, this seems to be a practical approach.

As to other concerns, the Committee also agreed that any property it may recover as a result of its avoidance actions would remain property of the Estate, and that the Diocese retains the ability to propose to settle such claims through a chapter 11 plan. Finally, the Committee acknowledged that it would not seek to add additional parties or claims to its proposed complaints without further approval from this Court.

Given the Diocese's limited objection, and the modifications to its proposals made by the Committee in response to the Diocese's limited objection, for these reasons, Court will grant the Committee's Motion and authorize the Committee to pursue the Avoidance Actions. However, in doing so, the Court admonishes all involved to stay focused on the overarching goals and

purposes of this chapter 11 case. As the parties have acknowledged, at bottom, this case is not so much about money as it is about helping heal the wounds of those impacted by the tragic events that led to the filing of the bankruptcy, while allowing the Diocese and its affiliates to continue to provide their commendable services. The Court is frustrated with the parties' inability to reach a consensus and their unwillingness to recognize that, in a real sense, every dollar expended on litigation is a dollar less to contribute to the eventual solution. In the event it later appears that the litigation the Committee proposes is not assisting the parties in settling their claims, the Court reserves the option to reconsider whether the Avoiding Actions should continue.[9]

## *Conclusion*

The Committee's Motion to commence, prosecute and settle the proposed Avoiding Actions on behalf of bankruptcy estate against Diocese and its affiliated entities, Dkt. No. 220, will be granted. Counsel for the Committee and the Diocese will cooperate in the submission of an approved form of order for entry by the Court.

Dated: March 1, 2018

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

---

[9] In this respect, the Court declines the Committee's request that it be granted "exclusive and irrevocable" authority to pursue the Avoiding Actions.