James I. Stang (CA State Bar #94435)
Kenneth H. Brown (CA State Bar #100396)
Ilan D. Scharf (NY State Bar #4042107)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Phone: (310) 277-6910
Fax:    (310) 201-0760

Attorneys to Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re: | ) Chapter 11 )  |
| Roman Catholic Bishop of Great Falls, Montana, a Montana Religious Corporation Sole (Diocese of Great Falls - Billings), | ) Bankruptcy Case No. 17-60271-JDP ) ) **NOTICE OF HEARING:** |
| Debtor in Possession. | ) **Date:** May 8, 2018 ) **Time:** 9:00 a.m. ) **Location:** 2nd Floor Ctrm ) Federal Building ) 400 N. Main ) Butte, MT |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO STIPULATION FOR RATAFICATION (SIC) OF CELL TOWER LEASE AND NOTICE OF HEARING**

The Official Committee of Unsecured Creditors (the "Committee") of the Roman Catholic Bishop of Great Falls, Montana, a Montana Religious Corporation Sole, Diocese of Great Falls-Billings ("DGFM" or the "Diocese"), hereby objects to the "Stipulation For Ratafication of Cell Tower Lease and Notice" (the "Stipulation") and has scheduled a hearing on the objection as set forth in the above caption.

Determining what is property of the estate is a lynchpin to resolution of this case. As one prong of the Committee's effort to have the Court make that determination, on December 18,

2017, the Committee filed its *Complaint for Declaratory Relief and Quiet Title* [Adv. No. 17-00082-JDP; Dkt. No. 1] (the "Complaint"), commencing this adversary proceeding (the "Adversary Proceeding") seeking, among other things, a declaratory judgment that certain real property is property of the estate pursuant to Bankruptcy Code section 541(a)(1) because (i) the parishes are not separate legal persons or entities and cannot hold title to property or be the beneficiaries of a trust and (ii) the Disputed Real Property Trusts[1] are void under the doctrine of merger. On March 5, 2018, the Committee filed a motion for partial summary judgment [Dkt. No. 25].

The proposed lease between the Diocese and Skyway Towers, LLC provides that the lease is between Skyway Towers LLC and the Debtor, "on behalf and for the benefit of Saint Xavier Mission."[2] For all of the reasons set forth in the Committee's motion for partial summary judgment, Saint Xavier Mission is not a separate legal person or entity from the Diocese and cannot hold title to property or be a beneficiary of a trust and any purported trust for the benefit of the Saint Xavier Mission would be void under the doctrine of merger.[3]

The Committee's is concerned that the Diocese will contend that its failure to object to the Court's approval of the Stipulation that recognizes a property interest of Saint Xavier Mission estops the Committee in the Adversary Proceeding. On April 5, 2018, Committee counsel emailed counsel for the Debtor and Skyway Towers, LLC requesting that they agree that the order approving the stipulation provide that it has no bearing on the Adversary Proceeding or

---

[1] The Disputed Real Property Trusts are those alleged trusts in which the Diocese asserts it holds certain real property.

[2] Committee counsel obtained a copy of the proposed lease from Skyway Towers, LLC's counsel as provided in the stipulation. A true and correct copy of the proposed lease is attached as Exhibit A.

[3] The Committee did not name each and every parish and mission as defendants in an effort to reduce administrative fees and expenses.

whether Saint Xavier Mission has a separate legal existence from the Diocese.  Neither counsel has confirmed that this proposed order is acceptable.

For all of the reasons set forth in the Committee's pending summary judgment motion, the Committee objects to the Stipulation to the extent it recognizes Saint Xavier Mission as an entity separate from the Diocese or establishes/recognizes a trust in favor of Saint Xavier Mission.

WHEREFORE the Official Committee of Unsecured Creditors respectfully requests that the Court enter an Order denying the Stipulation or an Order providing that it is not determinative of whether the Saint Xavier Mission exists as a separate entity from the Diocese or that the leased property is subject to a trust in favor of Saint Xavier Mission and that the parties reserve all rights with respect to the issues raised in the Adversary Proceeding.

Dated:   April 12, 2018

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By   */s/ James I. Stang*
James I. Stang (CA Bar No. 94435)
Kenneth H. Brown (CA Bar No. 100396)
Ilan D. Scharf (NY Bar No. 4042107)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:   (310) 201-0760
E-mail:   jstang@pszjlaw.com
              kbrown@pszjlaw.com
              ischarf@pszjlaw.com

Attorneys for the Official Committee of Unsecured Creditors

# EXHIBIT "A"

EXHIBIT "A"

## OPTION AND LEASE AGREEMENT

**THIS OPTION AND LEASE AGREEMENT ("Agreement"),** dated as of the latter of the signature dates below (the "Effective Date"), is entered into by and between <u>ROMAN CATHOLIC BISHOP OF GREAT FALLS, Montana,</u> a corporation sole, P.O. Box 1399, Great Falls, Montana, 59403-1399 (hereinafter "**Landlord**"), on behalf and for the benefit of SAINT XAVIER MISSION, P.O. Box 138 Xavier MT. 59075-0138, and Skyway Towers LLC, a Delaware limited liability company, with a mailing address of 3637 Madaca Lane, Tampa, Florida 33618 (hereinafter "**Tenant**").

### BACKGROUND

Landlord owns or controls that certain plot, parcel or tract of land, together with all rights and privileges arising in connection therewith, described as **S23, T04 S, R32 E, E2SW4, W2SE4 ( INCLUDES 19 AC ST XAVIER MISSION)**, near the City of <u>ST. XAVIER</u>, in <u>BIG HORN</u> County, State of <u>MONTANA</u>, (collectively, the "**Property**"). Tenant desires to use a portion of the **Property** to develop a wireless cellular tower facility. Landlord desires to grant to Tenant the right to use a portion of the Property in accordance with this Agreement.

The parties agree as follows:

1. **OPTION TO LEASE**

    (a) Landlord grants to Tenant an option (the "**Option**") to lease the Leased Premises, as defined below, on the Property, the dimensions of which are approximately **75 ft. L X 75 ft. W (5,625 square feet)**, including all the air space above said Leased Premises, together with a non-exclusive, unimpaired ingress/egress Easement, as defined below, for Tenant's use to and from the nearest public right-of-way along the Property (collectively, the "**Leased Premises**") as described on the attached **Exhibit 1**. The Property owned by the Landlord is legally described on **Exhibit 2** attached hereto.

    (b) During the Option period and any extension thereof, and during the term of this Agreement, Tenant and its agents, engineers, surveyors and other representatives will have the right to enter upon the Property and Leased Premises to inspect, examine, conduct soil borings, drainage testing, material sampling, radio frequency testing and other geological or engineering tests or studies of the Property (collectively, the "**Tests**"), to apply for and obtain licenses, permits, approvals, or other relief required of or deemed necessary or appropriate at Tenant's sole discretion for its use of the Leased Premises and include, without limitation, applications for zoning variances, zoning ordinances, amendments, special use permits, and construction permits (collectively, the "**Government Approvals**"), initiate the ordering and/or scheduling of necessary utilities, and otherwise to do those things on or off the Property that, in the opinion of Tenant, are necessary in Tenant's sole discretion to determine the physical condition of the Property and Leased Premises, the environmental history, Landlord's title to the Property and Leased Premises and feasibility or suitability of the Property for Tenant's Permitted Use, all at Tenant's expense. Tenant will not be liable to Landlord or any third party on account of any pre-existing defect or condition on or with respect to the Property and Leased Premises, whether or not such defect or condition is disclosed by Tenant's inspection. Tenant will restore the Property to its condition as it existed at the commencement of the Option Term (as defined below), reasonable wear and tear and casualty not caused by Tenant excepted. In addition, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all injury, loss, damage or claims arising directly out of Tenant's tests.

    (c) In consideration of Landlord granting Tenant the Option, Tenant agrees to pay Landlord the sum of One Thousand and No/100 Dollars ($1,000.00) (the "**Option Fee**") within thirty (30) business days of the Effective Date. The Option will be for an initial term of two (2) years commencing on the

Skyway Site Id: MT-06173
Page 1

Effective Date (the "**Initial Option Term**) and may be renewed by Tenant for an additional two (2) years upon written notification to Landlord and the payment of an additional One Thousand and No/100 Dollars ($1,000.00) prior to the expiration date of the Initial Option Term. Landlord agrees that the Option Fee and any additional Option Fees shall be applied to Rent upon the Commencement Date of this Agreement.

(d)   The Option may be sold, assigned or transferred at any time by Tenant upon notice to Landlord. Provided that buyer, assignee, or transferee agrees to be subject to the terms hereof, then from and after the date the Option has been sold, assigned or transferred by Tenant, Tenant shall immediately be released from any and all liability under this Agreement, including the payment of any rental or other sums due, without any further action.

(e)   During the Initial Option Term or any extension thereof, Tenant may exercise the Option by notifying Landlord in writing. If Tenant exercises the Option then Landlord leases the Leased Premises to the Tenant subject to the terms and conditions of this Agreement. If Tenant does not exercise the Option during the Initial Option Term or any extension thereof, this Agreement will terminate and the parties will have no further liability to each other.

(f)   If during the Initial Option Term or any extension thereof, or during the term of this Agreement if the Option is exercised, Landlord decides to subdivide, sell, or change the status of the zoning of the Leased Premises, Property or any of the Landlord's contiguous, adjoining or surrounding parcel or tract (the "**Surrounding Parcel**"), or in the event of foreclosure, Landlord shall immediately notify Tenant in writing. Any sale of the Property or Surrounding Parcel shall be subject to Tenant's rights under this Agreement. Landlord agrees that during the Initial Option Term or any extension thereof, or during the Term of this Agreement if the Option is exercised, Landlord shall not initiate, impose or consent to any change in the zoning of the Leased Premises, Property or Surrounding Parcel or impose or consent to any other restriction that would prevent or limit Tenant from using the Leased Premises for the uses intended by Tenant as hereinafter set forth in this Agreement.

## 2.   **PERMITTED USE**

(a)   Tenant desires to erect a wireless communications tower and other related improvements (collectively the "**Communications Tower Facility**" or "**Tower**") on the Leased Premises. The Property on which the Leased Premises sits is legally described on **Exhibit 2** attached to this Agreement and made a part hereof (the "**Property**"). Tenant will install wireless communication systems and sublease or license the right to transmit and receive communications signals to and from the Tower. Tenant may also construct buildings or cabinets on the Leased Premises to house equipment, with standard and emergency electrical provisions in and to the buildings or cabinets, together with the right to run columns, supports and foundations from the air space to, on and into the land below and attached and incorporated as though fully here set forth, for the support of the building(s) that Tenant agrees to allow subtenant to erect for their use. The buildings or cabinets and the base of the tower will be fenced with chain link and barbed wire, or other fence type as determined by Tenant or the respective governmental jurisdiction, for security at Tenant's expense.

(b)   A non-exclusive, unimpaired easement and right-of-way for ingress and egress from public roads, on foot or motor vehicle (the "**Easement**"), as shown on the attached sketch on Exhibit 1, to the Communications Tower Facility and related real property for twenty-four (24) hours per day, seven days per week over and across Landlord's Property from an adjacent public right-of-way for the purpose of providing Tenant and its subtenants with a right to cross, and means of reasonable ingress and egress, including temporary parking of vehicles and equipment, to and from the Communication Tower Facility to install, maintain, repair, operate, service, replace and remove the Tower and associated equipment and

Skyway Site Id: MT-06173
Page 2

005

buildings, utility wires, poles, cables, conduits, and pipes, and to provide utilities to Tenant's equipment on the Leased Premises.

(c) Should Tenant elect to construct a guyed tower, Landlord shall provide easements upon Landlord's Property for guy wire anchors, in three (3) directions 120 degrees apart and more particularly described in a survey (to be furnished on completion of construction of the Tower); and

(d) A non-exclusive, unimpaired utility easement and right-of-way, in, over and across the Property, for the purposes of providing Tenant with a right (and means of ingress and egress to) to install, maintain, repair, operate, service, replace and remove utility wires, poles, cables, fiber optic cables, conduits, and pipes, so as to provide utilities to the Tenant's Communications Tower Facility, to include a thirty (30) foot wide ingress and egress utility easement, as shown on the attached sketch on **Exhibit 1**, attached hereto and made a part hereof (the "**Utility Easement**").

(e) A non-exclusive, unimpaired landscape easement for the purposes of providing Tenant with a right to install vegetation and screening around the Leased Premises as necessary to meet the applicable landscaping and buffering requirements of the respective governing jurisdiction's regulations, statutes, codes, ordinances and/or conditions of approval, if and when such placement should ever be required (the "**Landscape Easement**").

(f) In addition to the foregoing, Tenant, its assigns, agents and contractors, are granted the right, at Tenant's sole cost and expense, to enter upon the Property and conduct studies as Tenant deems necessary to determine the suitability of the Property for Tenant's intended use. These studies may include, without limitation surveys, soil tests, environmental evaluations, radio wave propagation measurements, field strength tests, and other analyses and studies. Landlord shall cooperate with Tenant and execute and deliver all documents required to permit Tenant's intended use of the Property in compliance with zoning, land use, building and any other necessary regulations, whether local, state, or federal in nature; and

(g) Tenant shall have the right to assign all or part of the Utility Easement to successors and assignees, as necessary, including any utility providers, for the purpose of providing electric, telephone and other utilities to the Leased Premises, which shall include unlimited ingress and egress to the utility provider across the Property to install, maintain, repair, operate, service, replace and remove such utilities. Landlord agrees to execute and record a separate utility easement between Landlord and any such utility provider, if such recorded easement is required by the utility provider; and

(h) Landlord warrants that it has title to the Property, and no other person or corporation has the right to lease the same for the term and the renewals thereof granted by this Agreement. Landlord further covenants that Tenant, upon the payment of the rents herein, and the performance of all the conditions herein, shall have the peaceful and quiet possession of the Leased Premises, without hindrance on the part of the Landlord or any person or persons claiming by, through or under the Landlord, for the Term, as defined below, herein leased, except that Landlord may cultivate the remainder of the Property as long as it does not interfere with Tenant's use of the Leased Premises.

3. **TERM**

(a) The initial term of this Agreement will be five (5) years (the "**Initial Term**") commencing on the first day of the month following the date Tenant commences excavation for the construction of the tower foundation on the Property (the "**Commencement Date**"), unless otherwise terminated as provided in Paragraph 13 herein.

(b) Tenant shall have the right to renew this Agreement for nine (9) successive five (5) year periods (the "**Renewal Terms**"), on the same terms and conditions as set forth herein.

(c) This Agreement shall automatically be extended for each successive Renewal Term unless Tenant notifies Landlord of its intention not to renew prior to the commencement of the succeeding Renewal Term, on or before three (3) months before the end of the Agreement term or renewal.

(d) The Initial Term and any Renewal Terms shall collectively be referred to as the "**Term**".

4. **RENT**

(a) Within fifteen (15) days after the Commencement Date, and on the first day of each anniversary of the Commencement Date thereafter during the Term of this Agreement, Tenant covenants and promises to pay to Landlord as rent for the Leased Premises, FOUR THOUSAND EIGHT HUNDRED and NO/100 Dollars ($4,800.00) yearly. For each successive Term after the Initial Term, the Rent shall be increased SEVEN and ONE-HALF Percent (7.5%) over the previous term's Rent.

(b) As a condition precedent to payment, Landlord agrees to provide Tenant with a completed IRS Form W-9 upon execution of this Agreement and at such other times as may be reasonably requested by Tenant, including any change in Landlord's name or address.

(c) Tenant shall pay Rent by direct deposit, and Landlord agrees to provide to Tenant bank routing information for such purpose upon request of Tenant.

5. **APPROVALS**

(a) Landlord agrees that Tenant's ability to use the Leased Premises is contingent upon the suitability of the Property for Tenant's Permitted Use and Tenant's ability to obtain and maintain all Government Approvals. Landlord authorizes Tenant to prepare, execute and file all required applications to obtain Government Approvals for Tenant's Permitted Use under this Agreement and agrees to reasonably assist Tenant with such applications and with obtaining and maintaining the Government Approvals.

(b) Tenant has the right to obtain a title report or commitment for a leasehold title policy from a title insurance company of its choice and to have the Property surveyed by a surveyor of Tenant's choice. In the event Tenant determines, in its sole discretion, due to the title report results or survey results that the condition of the Property is unsatisfactory, Tenant will have the right to terminate this Agreement upon notice to the Landlord.

6. **USE AND MAINTENANCE** During the Term of this Agreement:

(a) Tenant will keep the Leased Premises in reasonably the same condition as they are at the Commencement Date, except Tenant may erect its Communications Tower Facility on the Leased Premises together with any buildings, foundations, or appurtenances thereto.

(b) Tenant will be responsible directly to the servicing entities for all utilities required by Tenant's use of the Leased Premises; however, Landlord shall cooperate with Tenant to obtain utilities from any location provided by the servicing utility.

(c) Tenant will be responsible for paying on a monthly or quarterly basis all utilities charges for electricity, telephone service or any other utility used or consumed by Tenant on the Leased Premises.

(d) Tenant will permit the Landlord at reasonable times on reasonable notice to enter on, inspect, and examine the Leased Premises from time to time.

7. **WAIVER OF LANDLORD'S LIEN** Landlord waives any lien rights it may have concerning Tenant's Communications Tower Facility installed on the Leased Premises, which are hereby deemed Tenant's personal property and not fixtures, and Tenant shall have the right to remove the same at any time without Landlord's consent.

8. **DEBT SECURITY** Title to Tenant's Communications Tower Facility, shelter and other equipment on the Tower and Leased Premises ("Tenant Facilities") shall be held by Tenant. All Tenant Facilities shall remain Tenant's personal property and are not fixtures. Tenant has the right to remove all Tenant Facilities at its sole expense on or before the expiration or earlier termination of the Agreement, provided Tenant repairs any damage to the Leased Premises caused by such removal. Landlord waives any lien rights it may have concerning the Tenant Facilities. Landlord acknowledges that Tenant may now or in the future enter into financing arrangements with financing entities for the financing of the Tenant Facilities (the "Collateral") with a third-party financing entity. In connection therewith, Landlord (i) consents to the installation of the Collateral, (ii) disclaims any interest in the Collateral as fixtures or otherwise, and (iii) agrees that the Collateral shall be exempt from execution, foreclosure, sale, levy, attachment, or distress for any Rent due or to become due and that such Collateral may be removed at any time without recourse to legal proceedings ("Landlord Consents").

Landlord acknowledges that Tenant has or will enter into certain financial arrangements with certain financial institutions as administrative agents for itself and various other lenders (the "Lenders"), also collectively referred to as "Mortgagee" and in connection therewith the Lenders will take a security interest in the Tenant Facilities and proceeds thereof (collectively the "Collateral") to be installed upon the Leased Premises. Landlord acknowledges and represents that the Landlord Consents shall inure to the benefit of Tenant, the Lenders and any replacement or refinancing Lenders and their successors and assigns for so long as the Agreement remains in effect.

Notwithstanding anything to the contrary contained in this Agreement, Tenant may assign, mortgage, pledge, hypothecate or otherwise transfer without Landlord's consent Tenant's interest in this Agreement to any financing entity, or agent on behalf of any financing entity (hereafter, collectively referred to as "Mortgagees") to whom Tenant (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers acceptances and similar facilities or in respect of guaranties thereof. Tenant shall give written notice to Landlord of any such assignment, mortgage, pledge or transfer of Tenant's interest in this Agreement.

Landlord agrees to notify Tenant and Tenant's Mortgagees simultaneously of any default by Tenant and to give Mortgagees the same right to cure any default as Tenant, except that a cure period for any Mortgagee shall not be less than ten (10) days after the receipt of the default notice. If a termination, disaffirmance or rejection of the Agreement by Tenant pursuant to any laws (including any bankruptcy or insolvency laws) shall occur, or if Landlord shall terminate this Agreement for any reason, Landlord will give to the Mortgagees the right to enter upon the Premises during a ninety (90) day period commencing upon the Mortgagees' receipt of such notice for the purpose of removing Tenant's Facilities. Landlord acknowledges that any Mortgagees shall be third-party beneficiaries of this Agreement, and no amendments or changes may be made to this Section of the Agreement without the written consent of the Mortgagees.

9. **INSURANCE AND LIABILITY** Tenant will maintain in full force and effect during the full term of this Agreement insurance in the amount of not less than $1,000,000.00 for bodily injury and property damage per occurrence with Tenant and Landlord as insured parties, as their respective interests

may appear, covering the risks generally specified in a public liability insurance policy. Tenant shall indemnify and hold Landlord harmless against any liability or loss from personal injury or property damage resulting from or arising out of the use or occupancy of the Property by Tenant, its employees or agents, except such liabilities and losses that are due to or caused by the acts or omissions of Landlord, or its employees or agents. Landlord shall indemnify and hold Tenant harmless against any liability or loss from personal injury or property damage resulting from or arising out of the use or occupancy of the Property by Landlord, or its employees or agents, except such liabilities and losses that are due or caused by the acts or omissions of Tenant, or its employees or agents.

**10.   MORTGAGES**   Landlord shall pay when due all payments on any mortgage secured by the Property in accordance with the terms of the mortgage. Mortgages executed by Landlord after this Agreement secured by the Property shall be expressly made subject to this Agreement so that Tenant shall not be affected by a foreclosure of any such mortgage.

**11.   INDEMNITY**   Landlord and Tenant each indemnify the other against, and hold the other harmless from any and all costs (including mediation, attorney fees and expenses) and claims, actions, damages, obligations, liabilities and liens which arise out of the breach of this Agreement by the indemnifying party.

**12.   HAZARDOUS SUBSTANCES**   Landlord has no knowledge of any substance, chemical, or waste on, under, or around the Property that is identified as hazardous, toxic or dangerous in any applicable federal, state or local law, ordinance, rule or regulation ("**Hazardous Substances**"). Landlord shall hold Tenant harmless from and indemnify Tenant against any damage, loss, expense, response costs, or liability, including consultants' fees and any legal and court costs and attorneys' fees resulting from the presence of Hazardous Substances being generated, stored, disposed of, on, transported to, on, under, or around the Property as long as the Hazardous Substances were not generated, stored, disposed of, or transported by Tenant, its employees, agents, or contractors. This paragraph shall survive the expiration or termination of this Agreement.

**13.   DEFAULT AND TERMINATION**   Subject to Paragraph 11, this Agreement may be terminated prior to the expiration of the Initial Term or any Renewal Terms without further liability, by providing no less than thirty (30) days prior written notice, for the following reasons:

(a)   By either party upon a default of any covenant or term hereof by the other party, which default is not cured within such thirty (30) day period; or

(b)   By Tenant if Tenant does not or cannot obtain or maintain any license, permit or other approval necessary for the construction and operation of Tenant's Communications Tower Facility; or

(c)   By Tenant if Tenant is unable to occupy and utilize the Leased Premises due to an action of the FCC, including but not limited to, a take back of channels or change in frequencies; or

(d)   By Tenant if Tenant determines that the Leased Premises is not appropriate for its operations, for economic or technological reasons, including without limitation, signal interference; or

(e)   The filing of bankruptcy or receivership by either party shall be a default upon the terms of this Agreement, and such party shall not have any period to correct the default.

(f)   On the earlier termination or expiration of this Agreement, Tenant shall retain the option, at its sole discretion, to remove all or any portion of the Communications Tower Facility from the Leased Premises. Landlord covenants and agrees that no part of the Communications Tower Facility constructed, erected or placed on the Leased Premises by Tenant will become, or be considered as being affixed to or a

part of, the Property. All improvements by Tenant on the Leased Premises will be and remain the property of the Tenant and may be removed by the Tenant, at Tenant's sole discretion, at any time during the Term.

**14.  ASSIGNMENT OF LEASE OR PROPERTY**  Tenant may assign, mortgage, or transfer this Agreement, in whole or in part by assignment or sublease, without the prior written consent of Landlord. This shall include leasing or subletting to others the right to transmit and receive communications signals by way of equipment on or attached to the Tower and/or the right to add or install equipment and/or buildings on the Leased Premises, together with rights of ingress and egress. Landlord may assign or otherwise transfer this Agreement, upon written notice to Tenant, except any assignment, conveyance or transfer of this Agreement, which is separate and distinct from a transfer of Landlord's entire right, title and interest in the Property, shall require the prior written consent of Tenant, which may be withheld in Tenant's sole discretion as more fully described in Paragraph 16. Upon assignment, including any assignment requiring Tenant's consent, Landlord shall be relieved of all liabilities and obligations hereunder and Tenant shall look solely to the assignee for performance under this Agreement and all obligations hereunder. Tenant's right to consent or not to consent to any transfer which is separate and distinct from a transfer of Landlord's entire right, title and interest in the Property is a continuing right in favor of Tenant and cannot be extinguished by Tenant's consent or non-consent on one or more occasion. For purposes of this paragraph, any assignment, transfer, bequest or devise of Landlord's interest in the Property or this Agreement as a result of the death of Landlord, whether by will or intestate succession, or any conveyance to Landlord's family members by direct conveyance or by conveyance to a trust for the benefit of family members shall not require Tenant's written consent.

**15.  SALE OF PROPERTY**

(a)  Landlord shall not be prohibited from the selling, leasing or using any of the Property except as provided below.

(b)  If Landlord, at any time during the Term of this Agreement, decides to rezone or sell, subdivide or otherwise transfer all or any part of the Property, to a purchaser other than Tenant, Landlord shall promptly notify Tenant in writing, and such rezoning, sale, subdivision or transfer shall be subject to this Agreement and Tenant's rights hereunder. In the event the Property is transferred, the new Landlord shall have a duty at the time of such transfer to provide Tenant with a completed IRS Form W-9, or its equivalent, and other related paperwork to effect a transfer in Rent to the new Landlord.

(c)  The provisions of this Section shall in no way limit or impair the obligations of the Landlord under this Agreement.

**16.  RIGHT OF FIRST REFUSAL/RENTAL STREAM OFFER**  If at any time after the date of this Agreement, Landlord receives a bona fide written offer for an instrument of sale, easement, loan, or other legal document, from a third party seeking an assignment and/or transfer of the revenue rental stream associated with this Agreement ("Rental Stream Offer"), Landlord shall immediately furnish Tenant with a copy of the Rental Stream Offer. Tenant shall have the right within twenty (20) days after it receives such copy and representation, to agree in writing to match the terms of the Rental Stream Offer. Such writing shall be in the form of a contract substantially similar to the Rental Stream Offer. If Tenant chooses not to exercise this right or fails to provide written notice to Landlord within the twenty (20) day period, Landlord may assign the rental stream pursuant to the Rental Stream Offer, subject to the terms of this Agreement. If Tenant fails or decides not to exercise such right, the right to match any Rental Stream Offer shall continue as to all new owners and offers.

**17.  TITLE TO PERSONAL PROPERTY**      Title to the Communications Tower Facility, and ownership thereof, its appurtenances and equipment, shall remain with and be in the name of the Tenant.

Skyway Site Id: MT-06173
Page 7

010

If this Agreement shall terminate or expire, Tenant retains the right to remove the Communications Tower Facility in accordance with Section 13(f).

**18.   NOTICES**   All notices under this Agreement must be in writing and shall be deemed validly given if and when sent by confirmed facsimile transmission, overnight express mail services or by certified mail, return receipt requested, addressed as follows (or any other address that the party to be notified may have designated to the sender by like notice):

**If to TENANT:**

> Skyway Towers LLC
> 3637 Madaca Lane
> Tampa, FL 33618
> ATTN: Property Management-Site Id: <u>MT-06173</u>
> Phone No.: (813) 960-6200
> Fax No.: (813) 960-6210

**If to LANDLORD:**
(Street address only)
> <u>121 23d St. So.</u>
> <u>GREAT FALLS,</u>
> <u>MT 59401</u>
> ATTN: <u>RICH MOOG</u>
> Phone No.: <u>(406) 727-6683</u>

**19.   SEVERABILITY**   If any term or condition of this Agreement is found unenforceable, the remaining terms and conditions will remain binding upon the parties as though said unenforceable provision were not contained herein. However, if the invalid, illegal, or unenforceable provision materially affects this Agreement then the Agreement may be terminated by either party on ten (10) business days prior written notice to the other party thereto.

**20.   CONDEMNATION/EMINENT DOMAIN**   In the event Landlord receives notification of any eminent domain or condemnation proceedings affecting the Property, Landlord will provide notice of the proceeding to Tenant within forty-eight (48) hours. If a taking or condemning authority takes the entire Property, or a portion sufficient, in Tenant's sole determination, to render the Property unsuitable for Tenant, this Agreement will terminate as of the date the title vests in the taking or condemning authority. The parties will each be entitled to pursue their own separate awards in the eminent domain or condemnation proceeds, which for Tenant will include, where applicable, the value of its Communications Tower Facility, moving expenses, prepaid Rent, and business dislocation expenses, provided that any award to Tenant will not diminish Landlord's recovery. Tenant will be entitled to reimbursement for any prepaid Rent on a prorata basis.

**21.   CASUALTY**   Landlord will provide notice to Tenant of any casualty affecting the Property or Leased Premises within forty-eight (48) hours of the casualty. If any part of the Communications Tower Facility or Property is damaged by fire or other casualty so as to render the Property unsuitable, in Tenant's sole determination, then Tenant may terminate this Agreement by providing written notice to the Landlord, which termination will be effective as of the date of such damage or destruction. Upon such termination, Tenant will be entitled to collect all insurance proceeds payable to Tenant on account thereof and to be reimbursed for any prepaid Rent on a prorata basis. If notice of termination is given, or if Tenant undertakes to rebuild the Communications Tower Facility, Landlord agrees to use its reasonable efforts to permit Tenant to place temporary transmission and reception facilities on the Property at no additional Rent until

Skyway Site Id: MT-06173
Page 8

such time as Tenant is able to secure a replacement location or the reconstruction of the Communications Tower Facility is completed.

**22.     TAXES**     Landlord shall be responsible for payment of all ad valorem taxes levied upon the Property, Leased Premises, improvements and other property of Landlord. In the event Landlord fails to pay any such taxes or other fees and assessments, Tenant shall have the right, but not the obligation, to pay such owed amounts and deduct them from the Rent amounts due under this Agreement. Tenant shall be responsible for payment of all documented increases in personal property, real estate taxes and assessments directly attributable to the Communications Tower Facility, only for so long as this Agreement remains in effect. Landlord shall provide Tenant with copies of all assessment notices on or including the Communications Tower Facility immediately upon receipt, but in no event less than seven (7) business days after receipt by Landlord. If Landlord fails to provide such notice within such time frame, Landlord shall be responsible for taxes due for the year covered by the assessment. Tenant shall have the right to contest, in good faith, the validity or the amount of any personal property tax or assessment levied against the Leased Property by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate. This right shall include the ability to institute any legal, regulatory or informal action in the name of Landlord, Tenant, or both, with respect to the valuation of the Communications Tower Facility. Landlord shall cooperate in the institution and prosecution of any such proceedings and will execute any documents required therefore. The expense of any such proceedings shall be borne by Tenant and any refunds or rebates secured as a result of Tenant's action shall belong to Tenant.

**23.     TEMPORARY ANTENNA FACILITIES**     Upon full execution of this Agreement, Tenant and its successors, sublessees and assigns, shall have the right to install, operate and maintain on the Property, at Tenant's sole discretion, temporary antenna facilities or a cell on wheels (collectively, herein referred to as "COW"). Tenant and its successors, sublessees and assigns shall have the right to install, operate or maintain a COW during initial construction of the Communications Tower Facility and, as required, upon any repair, modifications, maintenance or additions to the Communications Tower Facility, including, but not limited to, damage to the Communications Tower Facility caused by natural disaster or sabotage, throughout the Term of this Agreement. Any COW placed on the premises, in accordance with this Paragraph 23, will be in place only for so long as the Communications Tower Facility is not fully operational.

**24.     OTHER TELECOMMUNICATIONS TOWERS**     Landlord agrees that Landlord, with respect to property owned or controlled by Landlord, shall not operate, acquire, or engage in the operation or construction of a telecommunications tower or allow any third party to operate, acquire, or engage in the operation or construction of a telecommunications tower so as to directly or indirectly engage in any similar or competing business of Tenant within a radius of two (2) miles from the outside boundary of the Communications Tower Facility during the Terms of this Agreement.

**25.     MISCELLANEOUS**     The parties hereto mutually covenant and agree as follows:

(a)     This Agreement contains and embraces the entire agreement between the parties, and neither it, nor any part of it may be changed, altered, modified, limited or extended, orally or by any agreement between the parties, unless such agreement be expressed in writing, signed and acknowledged by the Landlord and the Tenant, or their successors in interest. If any term, clause or provision of this Agreement shall be judged to be invalid, the validity of any other clause or provision of this Agreement shall not be affected thereby. The failure by a party to enforce any provision of this Agreement or to require performance by other party will not be construed to be a waiver, or in any way affect the right of either party to enforce such provision thereafter.

(b)    Landlord agrees to execute a Memorandum of this Agreement which Tenant may record with the appropriate recording officer, the template of which is attached as **Exhibit 3**.

(c)    Tenant's obligations under this Agreement are contingent upon obtaining a satisfactory non-disturbance agreement from any mortgagee or other lienor. If a satisfactory non-disturbance agreement is not obtained, then at Tenant's option, all prepaid rent and deposits shall be returned to Tenant, and Tenant may terminate this Agreement by written notice to Landlord without further liability whatsoever.

(d)    This Agreement and all the covenants and agreements herein contained shall extend to, bind and run in favor of the heirs, personal representatives, successors and assigns, of the parties hereto.

(e)    This Agreement will be governed by the laws of the state in which the Property is located, without regard to conflicts of law.

(f)    The submission of this Agreement to any party for examination or consideration does not constitute an offer, reservation of or option for the Property based on the terms set forth herein. This Agreement will become effective as a binding Agreement only upon the handwritten legal execution, acknowledgement, and delivery hereof by Landlord and Tenant.

**SIGNATURES ON FOLLOWING PAGES**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be effective as of the last date written below.

WITNESSES:

*[signature]*
Print Name: RICHARD P. MOOG, DFO

*[signature]*
Print Name: Joan O. Drevecky

"LANDLORD" Roman Catholic Bishop of Great Falls, Montana, a corporation sole, for the sole use and benefit of St. Xavier Mission, Xavier, MT

By: *[signature]* Michael W Warfel
Print Name: Michael W. Warfel
Its: Bishop
Date: 7-10-2017

WITNESSES:

*[signature]*
Print Name: Pamela S. Howard

*[signature]*
Print Name: Amy Tomlinson

"TENANT"

Skyway Towers LLC,
a Delaware limited liability company

By: *[signature]*
Print Name: Scott M. Behuniak
Its: President / COO
Date: 7/17/17

Skyway Site Id: MT-06173
Page 11

014

015

# EXHIBIT 1

## DESCRIPTION OF LEASED PREMISES

The Leased Premises is 75 feet by 75 feet (5,625 square feet) along with required easements, as more particularly described and depicted in the attached legal description and/or sketch:

Notes:
1. This Exhibit may be replaced by a legal description and land survey and/or construction drawings of the Leased Premises once received by Tenant.
2. Any setback of the Leased Premises from the Property's boundaries shall be the distance required by the applicable governmental authorities.
3. Width of the access road shall be the width required by the applicable governmental authorities, including police and fire departments.
4. The Communications Tower Facility is illustrative only. Actual tower type will be shown on the construction drawings.

Skyway Site Id: MT-06173
Page 12

## EXHIBIT 2

The property is described as follows:

SITUATED IN THE COUNTY OF BIG HORN, STATE OF MONTANA:

THE EAST HALF OF THE SOUTHWEST QUARTER AND THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION TWENTY-THREE IN TOWNSHIP FOUR SOUTH OF RANGE THIRTY-TWO EAST OF THE MONTANA MERIDIAN, MONTANA

TAX ID NO: 22-0638-23-4-03-04-0000

**Note:**
This Exhibit may be supplemented or replaced by full legal description based upon a land survey of the Property once a land survey is received by Tenant.