UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re: | Chapter 11 |
| Roman Catholic Bishop of Great Falls, Montana, a Montana Religious Corporation Sole, | Case No. 17-60271 |
| the Debtor-In-Possession | |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE ROMAN CATHOLIC BISHOP OF GREAT FALLS, MONTANA

ELSAESSER ANDERSON, CHTD.
Ford Elsaesser, Esq.
Bruce A. Anderson, Esq.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815
Telephone: 208-667-2900
Facsimile: 208-667-2150

*Attorneys for the Debtor and Debtor-in-Possession*

Dated: May 30 , 2018

DISCLOSURE STATEMENT ....................................................................................................1

I.  INTRODUCTION................................................................................................................1

II.  NOTICE TO HOLDERS OF CLAIMS ............................................................................2

III.  EXPLANATION OF CHAPTER 11 ................................................................................4

    A.  OVERVIEW OF CHAPTER 11 .................................................................................4
    B.  CHAPTER 11 PLAN.................................................................................................5
    C.  CONFIRMATION OF A CHAPTER 11 PLAN ........................................................5
    D.  SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS ...............6

IV.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT ......8

V.  VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN.....................................11

    A.  MANNER OF VOTING ON PLAN .........................................................................11
    B.  CLAIM HOLDERS ENTITLED TO VOTE............................................................11
    C.  CLASSES IMPAIRED AND ENTITLED TO VOTE ON THE PLAN ...................12
    D.  VOTE REQUIRED FOR CLASS ACCEPTANCE ..................................................12

VI.  THE DEBTOR AND ITS OPERATIONS ........................................................................13

    A.  GENERAL BACKGROUND ...................................................................................13
       1.  Pre-Petition ....................................................................................................13
       2.  Need for Reorganization .................................................................................14
       3.  Response to Sexual Abuse ................................................................................15

VII.  THE CHAPTER 11 CASE .................................................................................................16

       1.  The Chapter 11 Filing .....................................................................................16
       2.   Retention of Counsel ......................................................................................16
       3.  Appointment of Creditors' Committee .............................................................16
       4.  Unknown Claims Representative ......................................................................17
       5.  Asset Sales and Other Dispositions; Planned Dispositions .............................17
       6.  Bar Dates and Objections to Claims ...............................................................18
       7.  Plan Exclusivity ..............................................................................................19
       8.  Post-Petition Operations and Select Financial Information .............................19
       9.  Post-Petition Litigation ...................................................................................21
       10. Mediation Efforts ...........................................................................................22
       11. Real Property of Parishes, Programs and Schools ..........................................23
       12. Insurance ........................................................................................................23

VIII.  SUMMARY OF THE PLAN ............................................................................................26

    A.  GENERAL.................................................................................................................26
       1.  Brief Explanation of Chapter 11 .....................................................................26
       2.  Acceptance of the Plan ....................................................................................27
       3.  Classification of Claims Generally ..................................................................27
    B.  CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN .........28
       1.  Unclassified Claims ........................................................................................28
          (a)   United States Trustee Fees. ................................................................. 28
          (b)   Administrative Claims. ........................................................................ 28
       2.  Priority Tax Claims .........................................................................................30
       3.  Class 1 – Other Priority Claims ......................................................................30
       4.  Class 2 – General Unsecured Convenience Claims .........................................30
       5.  Class 3 – Tort Claims ......................................................................................30
       6.  Class 4 – Unknown Tort Claims ......................................................................31
       7.  Class 5 – General Unsecured Claims ..............................................................31
       8.  Class 6 - Penalty Claims .................................................................................32
       9.  Class 7 – Employee/Retirement Claims ...........................................................32

10. Class 8 – Abuse Related Contingent Claims ........................................32
11. Class 9 – Oblates Claims .................................................................32
12. Class 10 – Shannon Claim ...............................................................32
13. Class 11 – Wilcox Claim .................................................................32
C.   MEANS FOR EXECUTION OF THE PLAN .............................................................33
1.   Establishment of the Trust ............................................................33
2.   Funding of Trust ..........................................................................33
3.   Establishment of Reserve Accounts ...............................................33
4.   Liquidation and Payment of Tort Claims ........................................33
5.   Treatment of Executory Contracts and Unexpired Leases .................34
D.   PROCEDURE FOR DETERMINATION OF CLAIMS OTHER THAN TORT CLAIMS BASED ON THE SEXUAL ABUSE PROOF OF CLAIM FORM ............................................35
1.   Objection to Claims .....................................................................35
2.   Disputed Claims ..........................................................................35
3.   Treatment of Contingent Claims ...................................................35
E.   PROVISIONS GOVERNING DISTRIBUTIONS ........................................................35
1.   Distribution Only to Holders of Allowed Claims .............................35
2.   Transmittal of Distribution ...........................................................36
3.   Timing of Distributions ................................................................36
4.   Form of Distributions ...................................................................37
5.   No Professional Fees or Expenses ..................................................37
6.   Claim Estimation .........................................................................37
7.   No Interest on Claims ...................................................................37
8.   Withholding Taxes .......................................................................37
9.   No De Minimis Distributions .........................................................38
10. Manner of Cash Payments .............................................................38

IX.   CONDITIONS TO EFFECTIVE DATE ....................................................38

A.   CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE ..........................................38
B.   WAIVER OF CONDITIONS ...............................................................................39
C.   NON-OCCURRENCE OF EFFECTIVE DATE ..........................................................39

X.   EFFECT OF PLAN CONFIRMATION ....................................................39

A.   POST-PETITION TORT CLAIMS .......................................................................40
B.   VESTING OF ASSETS .....................................................................................40
C.   CONTINUED EXISTENCE OF REORGANIZED DEBTOR ...........................................40
D..  EXCULPATION AND LIMITATION OF LIABILITY .................................................40
E.   CHANNELING INJUNCTION .............................................................................41
F.   SUPPLEMENTAL INJUNCTION PREVENTING PROSECUTION OF CLAIMS AGAINST SETTLING INSURERS..42
G.   INSURANCE SETTLEMENT AGREEMENT INJUNCTIONS ..........................................42
H.   TERMS OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH SETTLING INSURERS 43
I.   LIMITATION OF INJUNCTION AND DISCHARGE ...................................................43
J.   DEBTOR WAIVER AND RELEASE OF CLAIMS AGAINST SETTLING INSURER ...............43

XI.   NON-MONETARY COMMITMENTS ....................................................43

XII.   CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN ................43

1.   Causes of Action/Avoidance Actions ..............................................44
2.   Retention of Jurisdiction ..............................................................44
3.   Remand of Removed Actions .........................................................44
4.   Modification of the Plan ...............................................................45
5.   Severability ................................................................................45
6.   Section 1146 Exemption ...............................................................45
7.   Management of the Reorganized Debtor ..........................................45
8.   Dissolution of the Committee ........................................................46

XIII.   CONFIRMATION PROCEDURES ......................................................46

|      | A. | SOLICITATION OF VOTES; ACCEPTANCE | 46 |
|      | B. | CONFIRMATION HEARING | 46 |
|      | C. | BEST INTERESTS OF CREDITORS TEST | 48 |
|      | D. | FEASIBILITY | 48 |
|      | E. | CRAM DOWN | 49 |
| XIV. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 49 |
|      | A. | LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE | 49 |
|      | B. | ALTERNATIVE CHAPTER 11 PLANS | 50 |
| XV. | | CERTAIN FEDERAL INCOME TAX CONSIDERATIONS | 50 |
|      | A. | THE TRUST | 50 |
|      | B. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS | 51 |
| XVI. | | VOTING INSTRUCTIONS | 52 |
| XVII. | | CONCLUSION | 53 |

## EXHIBITS

Exhibit A:     Chapter 11 Plan of Reorganization Proposed by the Roman Catholic Bishop of Great Falls, Montana (Filed as a Separate Document)

Exhibit B:     Order Approving the Disclosure Statement (Proposed)

Exhibit C:     Liquidation Analysis

Exhibit D:     Class 2 and Class 5 Claims

## DISCLOSURE STATEMENT

On March 31, 2017 (the "**Petition Date**"), the Roman Catholic Bishop of Great Falls, Montana, a Montana Religious Corporate Sole (the "**Debtor**" or "**RCB**") filed a voluntary Chapter 11 petition with the United States Bankruptcy Court for the District of Montana (the "**Bankruptcy Court**"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued to own, operate and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**"). The Debtor seeks confirmation of its *Chapter 11 Plan of Reorganization Proposed by the Roman Catholic Bishop of Great Falls, Montana* (as it may hereafter be amended or modified, the "**Plan**").

Pursuant to §1125 of the Bankruptcy Code, the Debtor now submits this Disclosure Statement (the "**Disclosure Statement**") in connection with the Plan.

## I.

## INTRODUCTION

The Debtor provides this Disclosure Statement to all of the Debtor's known creditors and other parties in interest in order to provide adequate information to enable them to make an informed decision on whether to accept or reject the Plan. All holders of Claims are hereby advised and encouraged to read this Disclosure Statement and the Plan in its entirety before voting to accept or reject the Plan.

The Plan summary and statements made in this Disclosure Statement are qualified in its entirety by reference to the Plan (a copy of which accompanies this Disclosure Statement as **Exhibit A**).[1]

BY ORDER DATED _____ __, 2018 (THE "**DISCLOSURE STATEMENT ORDER**"), THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH INCLUDES AND DESCRIBES THE PLAN, AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE CREDITORS OF THE DEBTOR TO MAKE AN INFORMED DECISION ABOUT THE PLAN. A COPY OF THE DISCLOSURE STATEMENT ORDER IS ATTACHED HERETO AS **EXHIBIT A**. ONLY HOLDERS OF ALLOWED CLAIMS IN CLASS 3 (TORT CLAIMS OTHER THAN UNKNOWN TORT CLAIMS, CLASS 4 (UNKNOWN TORT CLAIMS) AND CLASS 5 (GENERAL UNSECURED CLAIMS), ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE DEEMED ACCEPTING CLASS 1, CLASS 2 AND CLASS 7 CLAIMS, AND THE DEEMED REJECTING CLASS 6, 8, 10 AND 11 CLAIMS, THE DEBTOR IS SOLICITING ACCEPTANCES OF THE PLAN FROM ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR.

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to them in the Plan.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTOR.   ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE ATTACHED DISCLOSURE STATEMENT ORDER. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, EXECUTED AND ACTUALLY RECEIVED BY THE DEBTOR BY 5:00 P.M. (PREVAILING MOUNTAIN TIME), ON _____, 2018 (THE "VOTING DEADLINE").**

The Court's approval of the Disclosure Statement does not constitute a recommendation by the Court either for or against the Plan.  No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement.  All other statements regarding the Plan and the transactions contemplated, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for August 14, 2018 at 9:30 A.M. (Prevailing Mountain Time) (the "Confirmation Hearing") at the United States Bankruptcy Court, Mike Mansfield Federal Courthouse, 400 North Main, Butte, Montana.  This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court will then also receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by the parties entitled to vote.

## II.

### NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR ON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT AND ALL EXHIBITS THERETO WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN OR**

ANY OTHER APPLICABLE DOCUMENT, THE TERMS OF THE PLAN OR ANY SUCH APPLICABLE DOCUMENT SHALL GOVERN. UNLESS OTHERWISE SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. THIS DISCLOSURE STATEMENT DOES NOT REFLECT EVENTS THAT MAY OCCUR AFTER THAT DATE AND MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ESTIMATED VALUE OF THE DEBTOR'S PROPERTY AND/OR THE ESTIMATED ASSETS TO BE GENERATED FROM THE LIQUIDATION OF THE DEBTOR'S ASSETS, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN CASTING YOUR VOTE WITH RESPECT TO THE PROPOSED PLAN.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, THE DEBTOR AND ITS ADVISORS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR THAT THE INFORMATION CONTAINED HEREIN IS FREE FROM ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

NOTHING IN THIS DISCLOSURE STATEMENT IS OR SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

ALTHOUGH THE DEBTOR'S PROFESSIONALS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED ON THE FACTUAL

**INFORMATION AND ASSUMPTIONS RESPECTING THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THE DEBTOR'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION.  SUCH PROFESSIONALS DO NOT REPRESENT OR WARRANT THAT THIS DISCLOSURE STATEMENT IS COMPLETE OR IS FREE FROM ANY INACCURACY OR OMISSION.**

Each Holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan (including all Exhibits and Schedules to the Plan and Disclosure Statement) in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  Except for the Debtor and certain of the Professionals it has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtor.  You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

**After carefully reviewing this Disclosure Statement, including the attached Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan pursuant to the procedures set forth in the Solicitation Package, which will be sent under separate cover.**

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

**THE DEBTOR URGES ALL HOLDERS OF
IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

**A.      Overview of Chapter 11**

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its operations in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a "Debtor-in-Possession" unless the Bankruptcy Court orders the appointment of a trustee.  In the Debtor's Case, the Debtor remains as the Debtor-in-Possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against a debtor or otherwise interfere with its property or operations. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed Chapter 11 plan.

## B.      Chapter 11 Plan

The formulation of a Chapter 11 plan is the principal purpose of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate. A Chapter 11 plan may provide anything from a complex restructuring of a debtor's operations and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of a plan, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan. The Plan incorporates a compromise reached among the Debtor and the Committee that the Debtor believes provides a fair and equitable allocation of the Debtor's assets that will be distributed to creditors and treatment of all Claims against the Debtor.

After a Chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, Section 1125 of the Bankruptcy Code requires the Debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the Plan. **This Disclosure Statement is presented to Holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.**

## C.      Confirmation of a Chapter 11 Plan

If all classes of Claims accept the Plan, the Bankruptcy Court may confirm the Plan if the Bankruptcy Court independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. **The Debtor believes that the Plan satisfies all the applicable requirements of Section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or, where applicable, interest in a particular class vote in favor of a plan for the Bankruptcy Court to determine that such class has accepted the Plan. Rather, a class of claims or interests will be deemed to have accepted a plan if the Bankruptcy Court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class. **Only the Holders of Allowed Claims and Tort Claims who actually vote will be counted as either accepting or rejecting the Plan**.

Furthermore, classes that are to receive no distribution under a plan are conclusively deemed to have rejected such plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.

**Classes 3 (Tort Claims other than Unknown Tort Claims), 4 (Unknown Tort Claims), and 5 (General Unsecured Claims), are impaired under the Plan and entitled to vote on the Plan.**

**Classes 1 (Other Priority Claims), 2 (General Unsecured Convenience Claims), and 7 (Employee/Retirement Claims) are deemed unimpaired under the Plan and are deemed to accept the Plan.**

**Classes 6 (Penalty Claims), 8 (Abuse Related Contingent Claims), Class 9 (Oblates Claims), Class 10 (Shannon Claim) and Class 11 (Wilcox Claim) are impaired and deemed to reject the Plan.**

In general, a Bankruptcy Court also may confirm a Chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a Chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, a plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that have not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class. **The Debtor believes that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.**

**D.     Summary of Classification and Treatment of Claims**

Detailed elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims, the relative allocations of property to Holders of such Claims, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan. However, the Debtor believes that a broad overview of what, in their opinion, the Debtor and  Creditors are likely to receive

under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan and the proposed treatment of each such Class under the Plan. This summary is qualified in its entirety by reference to the Plan:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 3 | Tort Claims | Impaired | Yes |
| 4 | Unknown Tort Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Penalty Claims | Impaired | Deemed to Reject |
| 7 | Employee/Retirement Claims | Unimpaired | Deemed to Accept |
| 8 | Abuse Related Contingent Claims | Impaired | Deemed to Reject |
| 9 | Oblates Claims | Impaired | Deemed to Reject |
| 10 | Shannon Claim | Impaired | Deemed to Reject |
| 11 | Wilcox Claim | Impaired | Deemed to Reject |

As discussed in the Liquidation Analysis attached hereto as **Exhibit C**, the Debtor estimates that recoveries for Holders of Classes 3, 4 and 5 will be greater than in liquidation under Chapter 7 of the Bankruptcy Code because the total amount of property available for distribution is greater under the Plan than in liquidation under Chapter 7. In addition, the Debtor believes that distributions under a Chapter 7 case would likely be delayed due to the time it will take a Chapter 7 trustee to assess the Debtor's assets, review and analyze claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or

reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

## IV.

## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**Why is the Debtor sending me this Disclosure Statement?**

The Debtor is seeking to obtain Bankruptcy Court approval of the Plan.  Prior to soliciting acceptances of the Plan, Section 1125 of the Bankruptcy Code requires the preparation and approval of a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

The Plan is based on two groups of settlements.  One settlement is between the Diocese, the Diocese Parties and the Settling Insurer.  This settlement is evidenced by the Insurance Settlement Agreement.  In general terms, the Insurance Settlement Agreement provide for (a) the Settling Insurer's buy back of the Policies from the Diocese Parties and (b) injunctions which prohibit, amongst others, Tort Claimants and Unknown Tort Claimants from suing the Settling Insurer.

The other settlement is between the Diocese, the Diocese Parties, and the Committee. This settlement states that the Tort Claimants will receive the grand total sum of $20 million dollars, which will be payable to the Trust set up through the Plan and Disclosure Statement process.  The funds will be allocated pursuant to the Allocation Protocol attached as Exhibit A to the Plan.  In addition, a fund in the amount to be determined will be established to pay Unknown Tort Claimants pursuant to the Plan, the Allocation Protocol and other Plan Documents.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

If the Plan is not confirmed, the Debtor believes it is unlikely that the Debtor will be able to reorganize.  The Plan memorializes a comprehensive settlement between the Debtor and the Committee, which allocates a substantial portion of the Debtor's assets to the Trust that will be established for the benefit of Tort Claimants and Unknown Tort Claimants.  In addition, confirmation of the Plan is necessary to effectuate the settlement with the Debtor's insurance carrier that will be used to fund the Plan and the Trust created pursuant to the Plan for the benefit of Holders of Tort Claims and Unknown Tort Claims.  If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated in the Plan could be implemented and what Holders of Claims would ultimately receive on account of their Claims.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan on account of, among other things, the cost of negotiating, drafting and potentially litigating an alternative Plan, as well as complex litigation regarding Tort Claims and the potential loss of funds from insurance carriers pursuant to settlements.  Moreover, non-confirmation of the Plan may result in dismissal of the Case in its entirety.  For a more detailed description of the consequences of this scenario, *see* "Best Interests of Creditors Test," which

begins on page 60 hereof, and the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"[2]**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective. References to the "Effective Date" means the later of 30 days or the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated.  Distributions will only be made on the Effective Date or as soon as practicable thereafter, based on, among other things, the amount of cash available to satisfy Claims, the time that the Abuse Claims Reviewer requires to complete his analysis of certain Tort Claims, the amount of Claims outstanding against the Debtor, and the Trustee's business judgment.  The Abuse Claims Reviewer analyzes the Tort Claims pursuant to the Allocation Protocol.  The Trust will distribute the funds after review of the Tort Claims is complete pursuant to the terms of the Plan, the Confirmation Order, the Allocation Protocol, the Trust Agreement and any other applicable Plan Documents.

**Where is the cash required to fund the Plan coming from?**

The cash required to fund the Trust that will pay Holders of Class 3 and 4 Claims, will come from (i) $12.0 million or more of cash from the Debtor, and (ii) $8.0 million of cash from the Settling Insurer.  The cost to fund payments to Holder of Class 4 Claims will come from $ to be determined cash from the Debtor.  The cash required to fund payments for Professional Fees and costs of the Trust will come from the Debtor and/or the Reorganized Debtor.

To fund its requirement to pay $12.0 million, the Debtor will liquidate the bulk of its investments held in the Capital Asset Support Corporation, investments held with the Catholic Foundation of Eastern Montana, and cash savings.  In addition, a substantial portion of the funding will come from the Catholic faithful, via contributions from the various parishes, missions and programs within the Diocese, and from a substantial contribution from the St. Labre Indian School and affiliated entities.  In consideration for such contributions, the parishes, missions and programs within the Diocese and the St. Labre Indian School and its affiliated entities will be beneficiaries of the Channeling Injunction and Supplemental Injunction as part of the Plan of Reorganization, and will require tort claimants to sign a general release as a prerequisite to receiving settlement amounts through the Plan.

**Will there be any releases granted to parties other than the Debtor as part of the Plan?**

Yes.  *See* "Exculpation and Limitation of Liability," which begins on page 40 and "Debtor Waiver and Release of Claims Against Settling Insurer," which begins on page 43.  A

---

[2] The descriptions' capitalized terms in response to this question are qualified in their entirety by reference to the definitions in the Plan.

Tort Claimant's Distribution is conditioned upon the Tort Claimant delivering a General Release to Protected Parties. The Ballots for the Tort Claimants contain the releases.

**Will there be any injunctions entered pursuant to the Plan?**

Yes. The Settling Insurer obtains the "Channeling Injunction," which begins on 41 and "Supplemental Injunction Preventing Prosecution of Claims against Settling Insurer," which begins on page 42. The Channeling Injunction will preclude Claimants from pursuing Claims against the parties protected by such Channeling Injunction whether or not such Claimants receive a Distribution under the Plan.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of a Claim in Classes 3, 4, and 5 (collectively, the "**Voting Classes**"), you may vote for or against the Plan by completing the Ballot and returning it as set forth in the Solicitation Packages which will be mailed out. *See* "Voting Instructions," which begins on page 11.

**What is the deadline to vote on the Plan?**

All Ballots must be actually received by the Debtor no later than 5:00 p.m. (Prevailing Mountain Time) on _____, 2018 (the "**Voting Deadline**").

**Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**When is the Confirmation Hearing scheduled to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for August 14, 2018 to take place at 9:30 a.m. (Prevailing Mountain Time) before the Honorable Judge Jim Pappas, United States Bankruptcy Judge, in the United States Bankruptcy Court, Mike Mansfield Federal Courthouse, 400 North Main, Butte, Montana. The Confirmation Hearing may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served on the Debtor and certain other parties, by no later than _____, 2018 at 5:00 p.m. (Prevailing Mountain Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit A**, it might not be considered by the Bankruptcy Court.

**What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization is the principal objective of a Chapter 11 case.  The confirmation of a plan of reorganization by the Bankruptcy Court binds a debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Case and the Plan.  A detailed description of the Bankruptcy Court's post-confirmation jurisdiction is provided in Section 15.1 of the Plan.

**Do the Debtor and the Committee recommend voting in favor of the Plan?**

Yes. The Debtor and the Committee recommend voting for the Plan because the Plan provides for a larger distribution, at the estimated Effective Date of the Plan, to the Debtor's unsecured creditors, including Holders of Tort Claims and Unknown Tort Claims, than would otherwise result from liquidation or any other reasonably available alternative.  Accordingly, the Debtor and the Committee recommend that Holders of Claims in Voting Classes support Confirmation of the Plan and vote to accept the Plan.

**V.**

**VOTING INSTRUCTIONS AND CONFIRMATION OF PLAN**

**A.      Manner of Voting on Plan**

Before voting, this Disclosure Statement, as well as the Plan, should be read in its entirety.  You should only use the Ballot sent to you in the Solicitation Package to cast your vote for or against the Plan.

**Ballots must be completed, dated, signed and returned pursuant to the procedures set forth in the Solicitation Package.**

**B.      Claim Holders Entitled to Vote**

Under the Bankruptcy Code, any holder of a claim in a class that is "impaired" under the Plan is entitled to vote to accept or reject a plan, unless such class of claims neither receives nor retains any property under the plan (in which case such class is deemed to have rejected the plan).  Bankruptcy Code §1124 provides generally that a Claim is impaired if the legal, equitable or contractual rights of the claim are altered.

Subject to the exceptions provided below, any Holder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Claim Holder has filed a Proof of Claim with respect to a Disputed Claim.  Pursuant to Federal Rule of Bankruptcy Procedure

3018(a), Class 3 Tort Claims shall be estimated at $1.00 for voting purposes only.  The actual amount payable on account of Class 3 Tort Claims will be determined pursuant to the Allocation Plan.

A Holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Debtor or by an Order of the Bankruptcy Court in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan.  In other words, only Holders of Allowed Claims, Class 3 Claims (Tort Claims other than Unknown Tort Claims which are estimated for voting purposes only at $1.00 for each Claim), Class 4 Unknown Tort Claims (estimated for purposes only at $1.00 for each claim) and Class 5 General Unsecured Claims, may vote to accept or reject the Plan.  A Claim to which an objection has been filed by the Debtor or any other party-in-interest no later than [---------------], 2018, or a Claim (i) that is listed on the Debtor's schedules as disputed, unliquidated or contingent, and (ii) with respect to which a superseding Proof of Claim has not been filed is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court allows the Claim (in whole or in part) by Final Order.  Upon request of a party-in-interest, the Bankruptcy Court may temporarily allow or estimate a Disputed Claim for purpose of voting on the Plan. Ballots cast in respect of Claims other than Allowed Claims, Tort Claims and Unknown Tort Claims will not be counted.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.      Classes Impaired and Entitled to Vote on the Plan

Claim Holders in Classes 3, 4 and 5 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.  Any controversy as to whether any Claim or Class of Claims is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

## D.      Vote Required for Class Acceptance

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of allowed claims in that class who cast ballots.[3]  Class 3 Tort Claims shall be estimated at $1.00 each for voting purposes only.  As such, if more than half of the number of Class 3 Tort Claimants who vote cast Ballots in favor of the Plan, will be deemed to have accepted the Plan.  The vote for Class 4 will be cast by the Unknown Claims Representative.

---

[3]  In the case of Tort Claims based on Sexual Abuse Proof of Claim Forms and Future Tort Claims, such claims will be deemed allowed in the amount of $1.00 claims for voting purposes only.

# VI.

## THE DEBTOR AND ITS OPERATIONS

**A.      General Background**

**1.      Pre-Petition**

The Roman Catholic Bishop of Great Falls-Billings, Montana, a Montana religious corporation sole ("**RCB**") is the civil entity formed under the corporation sole statute of the State of Montana in 1904 that holds and administers property  for the benefit of all the religious entities and functions that exist within the RCB, and allows the Diocese, parishes, and other entities and programs to function according to civil law.  The Debtor contends that the RCB holds title to church properties in trust for the practice of the Roman Catholic religion and conducts the civil affairs of Diocese.  The Committee disputes this contention.

The Roman Catholic Church is comprised of territories, known as Dioceses, each of which is subject to the authority of a Bishop who is responsible for the spiritual and pastoral well-being of the people who live within that Diocese.

Jesuit priests established the first Catholic Church in Montana in 1841 – St. Mary's Mission in Stevensville.  As time progressed and more Catholics moved to this mission territory that would become Montana, Churches were built in various locations.

The Diocese was originally established by the Vatican in 1904 as the Roman Catholic Diocese of Great Falls and was subsequently renamed the Diocese of Great Falls-Billings in 1980.  The Diocese is organized as a Montana Religious Corporation Sole under the Montana Religious Corporation Sole Act Sec. 35-3-101 et. seq. MCA. The individual parishes within the Diocese are separate public juridic persons (cc. 373, 515 Sec. 3) under the administration of its pastor.  Under Canon Law the parishes have a separate and distinct canonical legal existence from the Diocese and exists under civil law as unincorporated associations as a part of the diocese civil corporation. The "Diocese" or "Debtor" refers to the Corporation Sole, and for purposes of this Affidavit, the terms of the secular legal embodiment of the separate juridic person of the Diocese under Canon Law.

The Diocese is the ecclesiastical entity subject to the authority of the Bishop of Great Falls-Billings, currently Michael William Warfel who was appointed as Bishop of Great Falls-Billings effective November 20, 2007.  Bishop Warfel is responsible to govern the Diocese, following the precepts of Canon Law, the ecclesiastical law for the Roman Catholic Church.

The Diocese serves a geographical area consisting of 94,158 square miles and comprises two-thirds of the state of Montana.  Within the borders of the Diocese there are 33 of the 56 counties in Montana.   There are 50 parishes, 50 missions (100 churches) and approximately 38,000 Catholic individuals in the Diocese. These individuals and parishes are served by approximately 43 priests.   The Diocese has policies relating to the financial affairs of the parishes and each parish is expected to operate in conformity with those policies.  Beginning July 1, 2016, the assessment that each parish pays to fund the general operations of Diocese, is set at

twelve percent (12%) of the parish's ordinary income (principally the collections taken at Mass). Additionally, each parish promotes an annual Care and Share appeal to the parishioners for support of the operations of the Diocese.

Each Diocese is expected to fund the ministry of its Bishop, as well as the pastoral programs needed locally.  The Diocese funds Bishop Warfel and his pastoral responsibilities (such as visiting people throughout Diocese, tending to correspondence, meeting with consultative groups, and other matters allowing him to provide episcopal ministry for the priests and people of Diocese).

The Diocese maintains a number of departments.  The office of the Chancellor is the director of the Curia, oversees planning, and serves as Bishop Warfel's principal consultant. Other offices include the Finance Officer who oversees the Business Office (responsibilities include financial and related functions, including budgeting, accounting, investments, risk management, real estate and facilities, and employee and other benefits), Stewardship (responsibilities include parish development efforts and programs to support a culture of stewardship), Marriage, Family and Life (responsibilities include marriage preparation, family programs, outreach to people with disabilities, youth and young adults, and efforts to promote the dignity of life from conception to death),  Office of Vocations and Ministry (responsibilities include clergy formation, vocations, chaplaincies, deacon formation, and the Marriage Tribunal who works with the annulment process).

Along with the second Diocese in Montana, the Diocese supports the Montana Catholic Conference, which represents the Church in the civil forum and implements Catholic Social teaching, especially through education; Catholic Social Services of Montana, which provides adoption services and promotes pro-life activities, and a Superintendent of Schools, who is responsible for the operation of the Catholic Schools located in both Dioceses in Montana. More specific information is available on the RCB website at http://www.diocesegfb.org.

The Debtor contends that each ecclesiastical entity (a Parish, for example) within the RCB is a juridic person in Canon (ecclesiastical) law.  The Pastor for each Parish is appointed by the Bishop, but in Canon law, the Pastor of each Parish is the steward of the property of the parish to which he is appointed.  The corporation sole seeks to maintain the ecclesiastical distinctions while observing the actualities of the Montana Statutes.

## 2.      Need for Reorganization

In June of 2012, the RCB was served with a lawsuit (*Doe* cases as defined below), which was followed by a second lawsuit served January 2014 (*Becker* cases defined below), asserting that claimants were sexually abused by various priests, sisters, brothers and lay people serving specific parishes or institutions within the Diocese, generally, in the 1943-1993 time frame. These cases were filed as *Does, et al. v. Roman Catholic Bishop of Great Falls–Billings*, ADV-11-1078, Montana Eighth Judicial District Court, Cascade County ("The Does Case"); and as *Becker, et al. v. Roman Catholic Diocese of Great Falls–Billings*, BDV-12-0101, Montana Eighth Judicial District Court, Cascade County, Montana, ("The Becker Case").  The *Does* and *Becker* cases were subsequently consolidated and, as of their most recent filings, a total of 72 claimants came forward in those two lawsuits.  Additional, 14 other claimants have filed sexual

claims against the Debtor as of the Sexual Abuse Claims Bar Date. Of these 86 total claimants, only 22 are covered by the Diocesan insurance carrier, leaving 64 of the claims uninsured. Two of the abuse claims were set for trial to commence on July 10, 2017. Faced with likely prospect of adverse judgments being entered in these two cases, and the ongoing prospect of additional adverse judgments against the Diocese by the remaining claimants which collectively would jeopardize the financial viability of the Diocese and its ability to carry on its mission a Chapter 11 Bankruptcy Petition was filed on March 31, 2017.

The Diocese has now concluded in a series of multi-day mediation efforts that occurred both pre and post-petition. These efforts first involved the two primary Plaintiffs' group in the *Doe* and *Becker* cases, and the insurance carrier for the Diocese, and subsequently included the Committee following the filing of the Bankruptcy Petition. As the result of these mediation efforts, the parties have now successfully negotiated both the monetary compensation to be provided to the sexual abuse claimants and the non-monetary undertakings by the Diocese which will assist with the healing of sexual abuse claimants and mitigating the risk of any such abuse in the future for inclusion in the reorganization plan.

### 3.      Response to Sexual Abuse

Beginning in May of 1990, the Diocese adopted and put in place a formal written Sexual Ethics Policy, which was subsequently modified and updated in 1995, 2000 and 2001. Following the implementation of the United States Catholic Conference of Bishops Charter for the Protection of Children and Young People and the Essential Norms for Diocesan Policies Dealing with Allegations of Sexual Abuse of Minors by Priests (the "Charter and Norms") more expansive policies were adopted under the heading of the Diocese of Great Falls–Billings Child Protection Policy. The first phase of this implementation was completed in July of 2003. These policies mandated background checks for all priests and deacons with faculties of the Diocese, Seminarians, paid parish staff members, contract service staff and school employees who have regular contact with children. A Pastoral Code of Conduct was also adopted. A second phase of implementation of the Charter of Norms was completed in October of 2003, which was aimed at volunteers in the parishes and schools. During this time, the Diocese began utilizing Safe Environment Program training that is required to be completed by all Diocesan parish and school employees and volunteers. Similar program training was also implemented for children and youth and parents were provided access to awareness training. Among other things, the Diocesan Child Protection Policy makes it clear that childhood sexual abuse will not be tolerated within the Diocese, mandates reporting a violation from those involved in ministry within the Diocese and requires all employees and volunteers in the Diocese to undergo training and a full background check, state criminal records search, and national criminal sex offender search. For those who have not resided in Montana for the past seven years additional state searches are completed. These policies apply to all priests and deacons incarnated into the Diocese, all Seminarians affiliated with the Diocese; to women and men religious, laymen and women employed by and utilized as volunteers by the Diocese, its parishes, schools, institutions, offices or programs, and to all priests and deacons incarnated in a Diocese other than the Diocese of Great Falls–Billings but serving in any capacity here, and to men and women religiously serving in any capacity within the Diocese.

Additional examples of specific Diocesan actions in this regard include:

- Appointing a Victim Assistance Coordinator to receive complaints and assure that an abuse victim receives appropriate assistance

- Participating in annual compliance audits as arranged by the Office for Child and Youth Protection in the United States Conference of Catholic Bishops

- Establishing an independent review board which reviews all allegations of child sexual abuse and sexual misconduct made against clergy; and reviews all policies and procedures related to child abuse (including: reporting, prevention, response to victims) and recommends methods for strengthening policies and procedures.

- Initially utilizing the Virtus Program and currently the Safe and Sacred Program to implement a safe environment program, which includes training sessions which must be completed by all Diocesan, parish and school employees and volunteers; and establishing a protocol for ensuring compliance with these policies and procedures to ensure that all entities within the Diocese provide a safe environment for children.

## VII.

## THE CHAPTER 11 CASE

### 1.     The Chapter 11 Filing

The Debtor commenced its Case on March 31, 2017 (the "**Petition Date**").  The Debtor's Case was assigned to the Honorable Jim Pappas, United States Bankruptcy Judge.  The Bankruptcy Court has entered several orders in this Chapter 11 Case, each of which is available from the clerk of the Bankruptcy Court or may be viewed at the Bankruptcy Court's website: **www.mtb.uscourts.gov.**

### 2.     Retention of Counsel

Subsequent to the Petition Date, the Debtor remained in possession of its assets and property and continued to operate its businesses as the Debtor-in-Possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  By order of the Court, Elsaesser Anderson, Chtd. was authorized to act as bankruptcy counsel for the Debtor for this Case.

### 3.     Appointment of Creditors' Committee

Pursuant to §§1102(a) and 1102(b) of the Bankruptcy Code, the United States Trustee appointed an Official Committee of Unsecured Creditors (as defined above, the "**Committee**") to serve in the Debtor's Case.  The Committee consists of eight (8) individuals who hold Tort Claims against the Debtor.

The Committee retained the law firm of Pachulski Stang Ziehl & Jones LLP to represent it throughout this Case.  The Committee also retained Berkeley Research Group as its financial

advisor in the Case. Since its appointment, the Committee has taken an active role in the Debtor's Case and been involved in virtually every major event that transpired during the Chapter 11 process, including taking an active role in asset sales to maximize the value for the Estate, assisting in the terms of the Plan with the Debtor and its insurer, and negotiating internally and with other similarly situated Claimants over the terms of the Plan and a Plan to allocate funds to Tort Claimants.

The Committee has also performed its investigatory function by reviewing information supplied by the Debtor and third parties, as well as conducting its investigation to determine if any other assets could be made available to pay Claims of Tort Claimants or other creditors. The Committee also commenced certain litigation to enhance creditor recoveries as discussed below.

### 4.      Unknown Claims Representative

On May 8, 2018, the Debtor moved for the appointment of U.S. District Judge Michael R. Hogan, retired, as Unknown Claims Representative for the Debtor-in-Possession. The Unknown Claims Representative is the legal representative for those Claimants filing Tort Claims as defined in Section 2.54 of the Plan, for which a claim was not timely filed on the Bar Date. The Unknown Claims Representative's responsibilities and duties include: (i) undertaking an investigation and analysis to assist the Bankruptcy Court in determining the estimated number of Unknown Tort Claims and claim amounts held by the Unknown Tort Claimants; (ii) filing Proofs of Claim on behalf of all Unknown Tort Claimants by the Bar Date or any Bankruptcy Court ordered extension thereof; (iii) negotiating with the Debtor and other appropriate parties the Plan provisions for the evaluation, determination, and amounts of Unknown Tort Claims and number of Unknown Tort Claimants; (iv) advocating the legal position of the Unknown Tort Claimants before the Bankruptcy Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Unknown Tort Claimants; (v) taking all other legal actions reasonably necessary to represent the interests of the Unknown Tort Claimants; and (vi) serving as an independent fiduciary acting on behalf of all Unknown Tort Claimants.

Once the Unknown Claims Representative has completed his analysis, he will issue his Report and Recommendation. The number of Unknown Tort Claimants will be estimated. The treatment of Unknown Tort Claims is set forth below in the discussion of the treatment of Class 4 Claims.

### 5.      Asset Sales and Other Dispositions; Planned Dispositions

As detailed on Schedule A of the Debtor's Schedules, as of the Petition Date, the Debtor owned approximately 11 parcels of real property, listed below.[4]  The Debtor has sold, or intends to sell or encumber the following property:

       (a)      **Holy Rosary Church and School**: On July 25, 2017, the Debtor sold, with approval of the Court (Docket #99), property located at 521 Custer Avenue & 502 Broadwater Avenue, Billings, Montana. The property consisted of church property and school, and was sold for $1,250,000.00. The net proceeds will be used to

---

[4]  As described in the Schedules, the Debtor also holds title to various other pieces of real property, which the Debtor contends it holds in trust for its parishes and other Entities. The Committee asserts that such properties may be property of the estate, but any dispute over such properties is resolved by the Plan.

continue ministry and to further the consolidation of three sites into a single site through the construction of an elementary school in Billings, Montana. The proceeds are being held in trust by debtor for the Mary Queen of Peace Parish.

(b) **Most Blessed Sacrament:** On December 8, 2017, the Debtor sold, with approval of the Court (Docket #237), property located at 1325 Smelter Avenue, Black Eagle, Montana. The property consisted of a rectory, church and church parking lot and approximately 1.33 acres of land, and was sold for $250,000.00. The net proceeds from such sale are on deposit in the Debtor-in-Possession's account and are being held in trust for Most Blessed Sacrament Parish.

(c) **Our Lady of Guadalupe:** Physical addresses 523 S. 29th Street, Billings, Montana. On March 21, 2018, the Debtor sold, with approval of the Court (Docket #313), 2 lots, a church and residence, located in Billings, Montana for $295,000.00. The properties consisted of church building and residential building. The net proceeds from such sale are on deposit in the Debtor-in-Possession's account and are held in trust for Mary Queen of Peace Parish.

(d) **Villa Apartments:** Physical address of 1801 Tenth Avenue South, Great Falls, Montana. The Debtor has attempted to sell the Villa Apartments, an asset owned by the Debtor and not in trust for one of its parishes, missions or programs. Sales efforts have been slow due to various problems with the condition of the property. It is anticipated that the $1.8 million valuation placed on the property on the Debtor's schedules is overstated, and that the property when sold, will sell for in the range of $1 million to $1.2 million given its present condition. Proceeds from the sale will be used for general operation of the Debtor.

### 6. Bar Dates and Objections to Claims

By Order dated June 7, 2017 (the "**Bar Order**"), the Bankruptcy Court set July 31, 2017 (the "**Bar Date**") as the last day for creditors, including Tort Claimants, to file a proof of claim. A notice of the Bar Date was sent to in excess of 200 parties. In addition, publication notice of the Bar Date was made in approximately 16 regional and local newspapers on two (2) separate occasions.

The Debtor and the Committee's professionals have reviewed the Claims filed by creditors. A total of 86 Tort Claims have been timely filed in the Debtor's Chapter 11 Case. The Tort Claims identify 22 parishes or missions where the abuser came into contact with the survivor within the Diocese. The Tort Claims describe that the Claimants were all minors between three and seventeen years of age when the abuse began. At least 27 priests, nuns and lay religious are identified as abusers.

In addition, 60 non-Tort Claims were scheduled, of which 10 proofs of claim have been timely filed.

To the extent the Debtor has the right to object to Claims (only the Trust has the right to object to Tort Claims) and deems it prudent and/or cost effective to object to Claims, the Plan

provides that the Debtor has sixty (60) days from the Effective Date to file objections to filed Claims. If the Debtor fails to object to a properly filed Claim on or before sixty (60) days from the Effective Date, then such Claim will be deemed allowed if such Claim is a non-Tort Claim and will be entitled to the Distribution under the Plan applicable to the particular class in which such Claim is classified. The Plan provides that Tort Claims will not be Allowed Claims, but treated as provided in the Plan.

### 7.      Plan Exclusivity

Pursuant to §1121 of the Bankruptcy Code, a debtor-in-Possession is granted a 120-day exclusive period from the Chapter 11 filing date to file a Plan of Reorganization. During such time, only the Debtor can file a Plan of Reorganization. However, the Bankruptcy Code provides that the Court can increase a debtor's exclusive period to file and confirm a Plan of Reorganization for cause shown up to eighteen (18) months after commencement of the case. As of July 31, 2017, the Debtor's exclusive right to file a Plan terminated.

### 8.      Post-Petition Operations and Select Financial Information

Since the Petition Date, the Debtor has continued to operate its business. During a typical month, the Debtor spends approximately $800,638.00.

Set forth below is a summary of the Debtor's remaining assets as of April 30, 2018:

(a)      **Funds in Investment Account.** As of April 30, 2018, the Debtor had $7,400,466.00 on deposit. Such investments are not all liquid.

(b)      **Operating Cash.** As of April 2018, the Debtor maintained approximately $1,276,895.00 in cash in its operating account.

(c)      **Real Estate.** The Debtor currently owns eighteen parcels of real property with a value of approximately $13,792,283.00, as follows:

- Land, 160 acres in Cascade County, Montana, next to Mt. Olivet Cemetery, valued at $1,551,300.00;

- Calvary Cemetery, Cascade County, Montana, valued at $1,551,300.00;

- Chancery Building, 121 23rd Street S, Great Falls, Montana, valued at $399,768.00;

- Great Falls Central Catholic High School, 2800 18th Avenue S., Great Falls, Montana, valued at $4,950,000.00;

- Mt. Olivet Cemetery, 26th Street, S., Great Falls, Montana, valued at $552,418.00;

- Stites Retirement Residence, 1701 26th Street S., Great Falls, Montana,

4-Plex, valued at $325,000.00;

- Stites Retirement Residence, 1701 26th Street S., Great Falls, Montana, 9-Plex, valued at $625,000.00;

- Bishop's Residence, 1701 26th Street S., Great Falls, Montana, valued at $300,000.00;

- Villa Apartments, 58 unit apartment building, 1801 10th Avenue, S., Great Falls, Montana, valued at $1,800,000.00;

- Dwyer Cabin, 4904 Strains Lane, Monarch, Montana, value unknown;

- St. Thomas Camp, 4806 US Highway 89, Monarch, Montana, valued at $423,982.00;

- St. Thomas Camp 4814 US Highway 89, Monarch, Montana, valued at $16,310.00;

- Holy Cross Cemetery, 1601 Mullowney Lane, Billings, Montana, valued at $629,476.00

- Vacant Lot for Future Church Site, Briarwood Blvd., Billings, Montana, valued at $110,485.00;

- Vacant Lot for Future Church Site, Lot 58, Billings, Montana, valued at $212,282.00;

- Vacant Lot for Future Church Site, Lot 57, Billings, Montana, valued at $211,085.00;

- Raw Land, Valley County, Montana, valued at $1,852.00;

- Raw Land, Valley County, Montana, valued at $54,694.00;

- Raw Land, Valley County, Montana, valued at $24,875.00; and

- Vacant Land, Westgate Drive, Billings, Montana, valued at $54,456.00.

(d)     The Debtor currently owns personal property (Accounts Receivable, CASC Accounts Receivable, vehicles, office equipment) with a scheduled value of $10,698,290.00.  It is believed these assets are worth substantially less than as scheduled due to receivables that are uncollectible.

### 9.      Post-Petition Litigation

**Adversary Proceeding 18-00014-JDP - Complaint for Avoidance of Unrecorded Interests in Real Property and Quiet Title (Complaint to Avoid Transfers)**

During the course of the Bankruptcy, the Committee filed a *Motion for Exclusive and Irrevocable Authority to Commence Chapter 5 Avoidance Litigation.* The Court granted such motion and the Committee then filed a complaint to have the assets in the parishes, missions and programs, as well as the Capital Assets Support Corporation and Billings Catholic Schools to be determined to be assets of the Debtor. Debtor asserts that, under principles of Canon law, certain property that is held in title by the Diocese is, in fact, property of the parishes and other religious entities known as juridic persons under Canon law, rather than property of the Debtor's estate. The Committee disputes that assertion, and argues that all property held in title by the Diocese is property of the Diocese' estate pursuant to applicable U.S. and Montana civil law. The settlement embodied in the Plan resolves all aspects of this adversary proceeding. Resolution of this dispute through trial would be very costly, time consuming and with an unknown outcome to either party. The Debtor believes that its worst case outcome would likely jeopardize the Diocesan ministry and existence of the Diocese and its parishes. The Committee, while confident of the merits of its complaint, is cognizant of the likelihood that litigating the dispute through trial would be costly and could take many years to resolve through final appeal. As such, the parties resolved the dispute through the Plan in order to (a) avoid the cost of litigation (which could erode creditor recoveries), (b) resolve the matter more quickly, and (c) avoid the risk of loss at trial. Upon Confirmation of the Diocese Plan of Reorganization, the adversary proceeding will be dismissed with prejudice.

**Adversary Proceeding – 17-00082 Complaint for Declaratory Relief and Quiet Title**

The Committee filed an adversary proceeding which requested the Court declare that certain properties of parishes, missions and programs were not property of those entities, but were property of the Debtor's bankruptcy estate. The theories for such complaint paralleled those of the avoidance action in that it was argued that the parishes, missions and programs did not have a separate legal existence and could not hold title to property. The Committee moved for partial summary judgment on the bulk of the claims in the complaint, and the Debtor and parishes prepared opposing papers, which, while substantial, were never filed due to the intervening stay of the adversary proceedings by the Court and ultimate negotiated settlement that is embodied in the Plan. Upon confirmation of the Diocese Plan of Reorganization, the adversary proceedings will be dismissed with prejudice.

**Motion for Relief from Automatic Stay**

The Court granted relief from the automatic stay to allow two Survivors (the "Stay Relief Survivors") to continue prosecution of their cases before the Montana state court, which were pending prior to the Petition Date.

The Stay Relief Survivors filed their *Amended Joint Motion for Relief from the Automatic Stay and Notice* [Docket no. 266]. The Committee filed a joinder to the stay relief motion and a memorandum of law in support thereof [Docket nos. 261, 269]. The Stay Relief Survivors sought stay relief in an effort to break a mediation impasse. The Committee and Survivors participated in good faith in mediation before Bankruptcy Judge Zive with the Diocese

and Catholic Mutual (the Diocese's insurer). The purpose of the mediation was to achieve a global resolution of the chapter 11 case through a consensual plan. However, mediation resulted in an impasse. The Survivors and the Committee believe the impasse occurred, in large part, because the Diocese and/or Catholic Mutual (which insures the Survivors' claims) attributed unreasonably low values to the Survivors' claims. As such, they moved for relief from the automatic stay to test the amount of damages that a Montana State Court could award in a case of childhood sexual abuse by clergy.

The Committee requested that any grant of stay relief be limited to prosecution of a claim to judgment, and should not include the right to execute on any judgment (subject to further order of the Court). The purpose of the limitation was to allow for both a liquidated value of damages for a childhood sexual abuse claim and a disposition of all Survivors' claims through a chapter 11 plan.

The Diocese and Catholic Mutual opposed the motion for stay relief [Docket nos. 277, 278]. The Diocese argued that that it would be exposed to great harm if the two cases were tried because of the potential for a judgment in excess of policy limits. *See Diocese of Great Falls-Billings Objection to Amended Joint Motion for Relief From the Automatic Stay.*

After a contested hearing, the Court granted the relief requested by the Committee and the Stay Relief Survivors [Docket no. 302]. In light of the settlement of the Case embodied in the Plan, the Stay Relief Survivors have ceased any efforts to prosecute their cases in State Court. Their claims will be resolved through the Plan.

### Motion to Dismiss the Chapter 11 Case

On March 13, 2018, the Debtor moved for dismissal of the Chapter 11 case due to the parties inability to negotiate and agree to the terms of a consensual Chapter 11 Plan. Prior to making a determination on the Debtor's motion to dismiss, the Court required the Parties personally attend an in-person settlement conference for the purpose of arriving at a settlement and to go forward with confirmation of a consensual Plan of Reorganization. This settlement conference, discussed elsewhere in this Disclosure Statement, was held on April 9, 2018, before the Honorable Judge Gregg W. Zive, and resulted in the settlement that is now the subject of this Disclosure Statement and the Plan of Reorganization.

Both adversary proceedings, the State Court actions and Debtor's Motion to Dismiss are stayed while the Disclosure Statement and confirmation process proceeds forward, by the mutual agreement of the parties.

### 10.    Mediation Efforts

Prior to this Case, the Debtor, its Settling Insurer and representatives of the plaintiffs in the Abuse Cases entered into mediation to resolve the plaintiffs' claims and the disputes between the Debtor and the Settling Insurer. The mediation did not result in settlement. After the Case was commenced, a second mediation was held on September 6 and 7, 2017, pursuant to an order of the Bankruptcy Court, before the Honorable Judge Gregg W. Zive, in Reno, Nevada. That mediation spanned two days, and while progress was made, did not result in a settlement. Finally, a third mediation was held on April 9, 2018, again in Reno, Nevada, before the

Honorable Judge Gregg W. Zive. That mediation resulted in the settlement between the Committee, the Debtor, and Catholic Mutual. Such settlement is set forth in this Disclosure Statement and Plan.

### 11.    Real Property of Parishes, Programs and Schools

In its Bankruptcy petition and Schedules, the Debtor has, at Exhibit 7, disclosed $70,922,622 of real property belonging to Parishes and programs and being held in trust by the Debtor for such Parishes and programs. According to the Debtor, the Code of Canon Law of the Roman Catholic Church generally provides that each entity within the Diocese (*e.g.* parish, school, institution) is a separate entity within the Church. The Debtor may have title to property that is held in trust, or for the benefit of those separate entities. Therefore, the Debtor takes the position that the property listed on Exhibit 1 to the Bankruptcy petition and Schedules is held for the benefit of the parishes, schools, and institutions of the Diocese, and is not property of the Estate.

The Committee reserves rights to challenge the position that the properties set forth in Exhibit 7 to the Bankruptcy petition and Schedules are not property of the Estate. However, the Plan represents a settlement of any dispute that could be raised regarding ownership.

### 12.    Insurance

### A.    Background

Shortly after being served with the complaints filed in the *Does* and *Becker* litigations, Debtor tendered defense of these claims to the settling insurer (Catholic Mutual). Catholic Mutual agreed to provide a defense, subject to a reservation of rights, maintaining that the allegations in the Complaint may not constitute "accidents" or "occurrences" under the subject insurance certificates; that claims for pure "emotional distress" may not constitute "bodily injury" or "personal injury," as defined by the subject certificates and/or that the asserted damages arose from an occurrence or accident that took place outside of its coverage periods.

The Debtor and the Plaintiffs then engaged in extensive formal and informal discovery. This discovery included deposing a representative group of claimants; the review of completed Questionnaires developed by the Debtor and Catholic Mutual setting forth detailed information supplied by each respective claimant and the further production and review of thousands of documents and records, covering each claimant's personal, educational, employment and medical background.

Following receipt and consideration of the additional information that had been provided throughout discovery, including information related to the dates of the alleged acts of physical sexual abuse, Catholic Mutual modified its coverage position in December 2016. Based on this new information, Catholic Mutual determined only 15 individual claims occurred during Catholic Mutual's annual coverage periods from March 1, 1974, to date. As to these claims Catholic Mutual accepted coverage without any reservations of rights and agreed to defend and indemnify the Diocese. Six of those 15 claims were brought by the Plaintiffs in the *Does* case, with the remaining 9 being brought by the Plaintiffs in the *Becker* case. Catholic Mutual did not believe that any of the

remaining 55 claims in the *Does* and *Becker* cases triggered coverage under their certificates, because the alleged acts of physical sexual abuse occurred entirely outside of Catholic Mutual's coverage period.  In March 2017, this coverage position was subsequently extended to 6 additional individual Proof of Claims that were filed prior to the Sexual Abuse Claims Bar Date, thereby providing admitted coverage (without any reservations of rights) for 22 of the now 86 Proof of Claims.  This left 64 claims without coverage by Catholic Mutual, with the Debtor having no potential insurance coverage through any other insurance provider, other than that provided by Catholic Mutual.  Further, Debtor did not challenged Catholic Mutual's coverage position, as there is no dispute to the coverage periods under the insurance certificates and the corresponding time periods within which the 86 presented abuse claims would have occurred.

The parties then engaged in the first of three mediation sessions.  The first occurred in March of 2017, under the supervision of Frank E. (Dirk) Murchison, an attorney from Taos, New Mexico, with prior mediation experience involving clergy-related sexual abuse claims.  This mediation involved the Debtor and its counsel; Catholic Mutual and its counsel, and counsel for the Plaintiffs in the *Does* and *Becker* cases, which was likewise attended by approximately 6 claimants.  The mediation extended over 2½ days on March 14, 15 and 16, 2017.

A second round of mediation occurred on September 6 and 7, 2017, again involving the Debtor and Catholic Mutual (and their respective counsel) and counsel for the Plaintiffs.  Counsel for the Unsecured Creditors Committee and the committee members also participated.  This mediation was under the supervision of Hon. Gregg W. Zive, U.S. Bankruptcy Judge for the District of Nevada, located in Reno, NV.  A follow-up mediation involving Hon. Judge Zive occurred April 10, 2018, with the same participants (absent members of the Unsecured Creditors Committee who were consulted during the mediation via telephone).  Also participating were approximately 8 representatives of certain Parishes located within the Diocesan, along their own separate counsel, in that said Parishes had been joined as party defendants in an adversary proceeding filed in the bankruptcy seeking to expose parish assets for payment of debts of the Debtor.

In the course of these three formal mediation sessions, the parties spent approximately 48 hours attempting to settle the subject claims.  Each mediation session included approximately 20 attorneys.  Although these formal mediation efforts proved to be unsuccessful, the last mediation in April of 2018 provided sufficient movement, such that the parties continued their negotiations informally through Judge Zive.  These subsequent discussions occurring over the course of two weeks resulted in the Debtor reaching a settlement in principle with the Plaintiffs in the *Does'* and *Becker cases*, Catholic Mutual, the Unsecured Creditors Committee along with a settlement of the claims asserted against the parishes of the Diocese.  The amount being paid by the Catholic Mutual under the settlement is $8,000,000.

As noted, the settling insurers participation in the settlement arises out a series of liability coverage certificates provided to the Diocese for annual coverage periods between March 1, 1974, to date.  Of the 86 Proof of Claims, 22 alleged physical abuse during Catholic Mutual's periods of coverage.  Catholic Mutual accepted these 22 claims as being covered without any reservation of rights, resulting in no coverage defense issues being dealt with in the course of the mediation and the ultimate settlement.  Further, the debtor had determined there was no potential applicable

insurance coverage other than that provided by the Catholic Mutual and, as such, there was no insurance available for the remainder of the 86 claims.

Catholic Mutual contends for a variety of reasons that the foregoing amounts far exceed the amounts that it could conceivably be deemed obligated to pay pursuant to the policies in connection with the tort claims, including the claims of the Plaintiffs in the *Does* and *Becker* cases, and unknown tort claims that might be asserted against the Debtor. The Debtor disagrees. However, given that it would take many years of substantial time and financial resources to try all of the abuse cases, and the potential risk of litigation and exposure of the Debtor's assets to adverse judgments on uncovered claims, it was determined to be in the Debtor's best interest to resolve the claims and disputes consensually. In addition, the vast majority of the living Plaintiffs are at least 60 years of age and many much older and/or sick. Consequently, there was the very real possibility that those Plaintiffs would never benefit without settlement because they would not live to see their trial.

## B.  Settlement Negotiations and Mediation.

As noted, the parties engaged in three mediated settlement negotiations under the supervision of Frank "Dirk" Murchison, Esq. between March 2017 and April 2018. Under the mediator, and later two sessions before Honorable Gregg W. Zive, extensive negotiations took place among the Debtor, its counsel, state-court counsel representing claimants, including those on the Committee, and the Settling Insurer's representatives and their counsel. As noted above, the negotiations and mediation were extensive and intensive. As a result of the mediation and further negotiations, the Debtor and Settling Insurer, with the support of the plaintiffs in the Becker Case and Does Case, agreed in April 2018 on essential terms of a settlement and have negotiated the terms and details of the Insurance Settlement Agreement.

## C.  The Insurance Settlement.

Principal terms of the Insurance Settlement Agreement include:

**Settlement Amount/Purchase Price**. The Settling Insurer will pay a total of $8,000,000 to a post-confirmation Trust, upon agreed notice, within 10 days after the Bankruptcy Order becomes a Final Order (*i.e.*, non-appealable) and 10 days after notice that such Order has become Final Order is provided to the Settling Insurer by the Trustee. Under the Insurance Settlement Agreement, the "Trust" is the entity to which all Tort Claims are channeled as the sole and exclusive source of payment of Tort Claims against the Debtor, the Diocese Parties or the Settling Insurer.

**Releases**. The Debtor and other releasing Diocese Parties, on the one hand, and the Settling Insurer, on the other, will grant complete mutual releases as to, among other things, any and all past, present, or future Claims in connection with, relating to, or arising out of, in any manner or fashion, the Tort Claims, the Policies and the Reorganization Case, as set forth in the Insurance Settlement Agreement. All Tort Claimants will be required to sign a release of the Protected Parties as to their tort claims.

**Sale and Buyback of Policies**.  The Debtor and other releasing Diocese Parties will sell all of their Interests in the Policies, free and clear of all liens, claims, encumbrances and other Interests pursuant to 11 U.S.C. § 363.

**Supplemental Injunction**.  The Settling Insurer will be entitled to receive the benefit of a Supplemental Injunction under the Plan and Order confirming such Plan pursuant to 11 U.S.C. §§ 105(a) and 363.  Any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants,  Perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreement) against any of the Protected Parties, Insured Entities, or the Policies, which, directly or indirectly, relate to, any of the Policies, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurer, Insured Entities, and/or the Policies.

**Conditions to Settling Insurer's Payment**.  The Settling Insurer's payment is conditioned on, among other things entry of the Confirmation Order, and such Order becoming a Final Order. The Plan must be in all aspects consistent with the Insurance Settlement Agreement and contain no provisions that diminish or impair the benefits to which the Settling Insurer is entitled under the Insurance Settlement Agreement.  The Insurance Settlement Agreement shall be approved as part of the Plan confirmation.

# VIII.

# SUMMARY OF THE PLAN

The Debtor and the Committee submit that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Case were converted to Chapter 7.  Therefore, the Debtor and the Committee submit that the Plan is in the best interests of the Creditors and the Debtor and the Committee recommend acceptance of the Plan by holders of Claims in Classes 3, 4 and 5.

**THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.**

A.    **General**

1.    **Brief Explanation of Chapter 11**

Chapter 11 is the principal business or operations reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business or operations for the benefit of itself and its creditors.  Upon the filing of a petition for reorganization under Chapter 11 and during the pendency of the case, the Bankruptcy Code imposes an automatic stay of all attempts to collect claims or enforce liens against the Debtor, including the commencement of any sexual abuse litigation.

Confirmation and consummation of a plan of reorganization is the principal objective of a Chapter 11 case. In general, a plan divides the claims against a debtor into separate classes and allocates plan distributions among those classes. If the legal, equitable and contractual rights of a class are unaffected by a plan, such class is considered "unimpaired". All unimpaired classes are deemed to have accepted a plan and therefore are not entitled to vote thereon. Bankruptcy Code §1126(g), on the other hand, provides that all classes of claims that do not receive or retain any property under a plan on account of such claims are deemed to have rejected such plan. All classes of claims that are considered "impaired" are entitled to vote on a plan.

Under the Bankruptcy Code, acceptance of a plan is determined by class; therefore, it is not required that each holder of a claim in an impaired class vote in favor of a plan in order for the Bankruptcy Court to confirm a plan. Generally, each impaired class must vote to accept a plan; however, the Bankruptcy Court may confirm a plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept a plan and certain other statutory tests are satisfied. Many of these tests are designed to protect the interests of creditors who either do not vote or vote to reject such plan but who will nonetheless be bound by such plan if it is confirmed by the Bankruptcy Court.

### 2. Acceptance of the Plan

As a condition to confirmation, Bankruptcy Code §1129(a) requires that: (a) each impaired class of claims votes to accept the plan; and (b) the plan meets the other requirements of §1129(a). As explained above, classes that are unimpaired are deemed to have accepted the plan and therefore are not entitled to vote thereon, and classes that do not receive or retain any property under the plan are deemed to have rejected the Plan and likewise are not entitled to vote thereon. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims classified in impaired Classes that are to receive distributions under the Plan.

An impaired class of claims will be deemed to have accepted a plan if holders of at least two-thirds in dollar amount and a majority in number of claims in such class who cast timely ballots vote to accept the plan.

### 3. Classification of Claims Generally

Bankruptcy Code Section 101(5) defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Bankruptcy Code Section 1123 provides that a plan of reorganization shall designate classes of claims against a debtor. Bankruptcy Code Section 1122 further requires that each class of claims contain only claims that are "substantially similar" to each other. The Debtor believes that they have classified all Claims in compliance with the requirements of Sections 1122 and 1123. However, it is possible that a Holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required

for the Plan to be confirmed.  In such event, the Debtor would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class of which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of Claims may necessitate a re-solicitation.

**B.     Classification and Treatment of Claims Under the Plan**

The following describes the classification of Claims under the Plan and the treatment that Holders of Claims, whether Tort Claims or otherwise, are to receive if the Plan is confirmed and becomes effective.  A Claim is classified in a particular Class only to the extent that the Claim fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim fits within the description of such different Class.

**1.     Unclassified Claims**

The Plan does not classify Administrative Claims, statutory fees due to the United States Trustee, or Priority Tax Claims, but does provide for the following treatment of such Claims.

**(a)     United States Trustee Fees.**  All fees payable by the Debtor under Section 1930 of Title 28 of the United States Code that have not been paid prior to the Effective Date shall be paid by the Debtor or the Reorganized Debtor on or before the Effective Date.  In addition, the Debtor, or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, shall be liable for and shall pay such fees until the entry of a final decree in this Case or until the Case is converted or dismissed.  The Reorganized Debtor shall file post-confirmation operating reports with the Bankruptcy Court and the United States Trustee until a final decree is entered.

**(b)     Administrative Claims.**     An "Administrative Claim" is a Claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the Estate or operating the Debtor's businesses after the commencement of a Chapter 11 case, loans and advances made to the Debtor after the Petition Date, compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331 or 503, certain retiree benefits, certain reclamation Claims, and all fees and charges against the Estate pursuant to Chapter 123 of Title 28 of the United States Code.

The Plan provides that each holder of an Allowed Administrative Claim (including, without limitation, the professionals' fees and expenses incurred by the Professionals and allowed in a Final Order of the Bankruptcy Court) shall be paid in full, in Cash, by the Reorganized Debtor (i) on the later to occur on the Effective Date or the date the Order allowing such Administrative Claim becomes a Final Order; (ii) upon such other terms as may exist in the ordinary course of business of the Debtor; or (iii) upon such terms as may exist pursuant to Order of the Bankruptcy Court or an agreement between such Holder of an Allowed Administrative Claim and the Debtor.

The Debtor estimates that the aggregate final amounts due to professionals shall total approximately $750,000. This includes the professional fees of Elsaesser Anderson, Chtd., bankruptcy counsel for the Debtor, and Pachulski Stang Ziehl & Jones LLP, counsel for the Creditors' Committee. It also includes the fees of Douglas Wilson and Company, accountants; Davis, Hatley, Haffeman & Tighe, P.C., counsel to the Debtor. The $750,000 in professional fees represents the Debtor's best estimate of the unpaid fees due through the Effective Date.

To assist in Debtor raising the necessary funds to fund the Trust on a timely basis, counsel for the Committee, Pachulski Stang Ziehl & Jones LLP has agreed to defer payment of its approved but unpaid legal fees to on or before January 31, 2019.

With respect to the trade Claims arising after the Petition Date representing obligations incurred by the Debtor in the ordinary course of its businesses consistent with past practice, such trade Claims shall be paid in the ordinary course of business. The Debtor estimates that post-petition ordinary course payables as of the Effective Date will be approximately $108,000.00. As to other Allowed Administrative Claims, except as otherwise provided in the Plan, the Plan provides that each Holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Debtor on the Effective Date or the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, cash equal to the amount thereof, unless the Holder agrees to less favorable treatment of such Allowed Administrative Claim.

The Plan further provides that Professional Persons with Claims for services rendered during this Chapter 11 Case, must file requests for payment within forty-five (45) days after notice of the Effective Date is filed with the Bankruptcy Court.

Administrative Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order (including, without limitation, Claims for professionals' fees and expenses) shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. After the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of the Professional Persons employed by the Debtor in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.

Administrative Claims representing fees and expenses of Professionals that are employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan may be paid by the Debtor or the Reorganized Debtor, after notice and a hearing, or by the Trust from contributions by the Debtor or the Reorganized Debtor in addition to the amounts payable to Tort Claimants under the Plan.

Administrative Claims representing fees and expenses of Professionals that are employed by the Debtor prior to the Effective Date of the Plan shall not be paid by the Trust.

2.        **Priority Tax Claims**

A "Priority Tax Claim" is an Unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of the Bankruptcy Code §507(a)(8). The Debtor has no pre-petition tax claims entitled to priority.

3.        **Class 1 – Other Priority Claims**

Class 1 consists of Other Priority Claims. These are claims entitled to priority under Section 507(a)(3) – (a)(7) and 507(a)(9) – (a)(10). These are claims for unpaid wages, employee benefit Plan contributions and the like. The Debtor does not believe that any such Claims exist. However, in the event a Claim is allowed as an Other Priority Claim, such Claim shall receive either (a) payment from the Reorganized Debtor in the full amount of its Allowed Claim in cash, of the Effective Date or when such Claim becomes an Allowed Claim or (b) payment upon such terms as may be agreed in writing between the Holder of such Other Priority Claim and the Reorganized Debtor.

4.        **Class 2 - General Unsecured Convenience Claims**

Class 2 consists of the Holders of General Unsecured Convenience Claims against the Debtor or Holders of Unsecured Claims who elect to be treated as a General Unsecured Convenience Claim. These Claims are unsecured creditors of Claims of $500.00 or less or who voluntarily reduce their Unsecured Claim to $500.00. Class 2 Claims total $6,784.61. The Plan provides that all Holders of Allowed Class 2 Claims will receive either (a) payment from the Reorganized Debtor in the amount of $500.00 or less in cash on the Effective Date or when such Claim becomes an Allowed Class 2 Claim, or payment of the Allowed Class 2 Claim upon such terms as may be agreed in writing by the Holder of such Allowed Class 2 Claim and the Reorganized Debtor. Class 2 is unimpaired under the Plan and Holders of Class 2 Claims are not entitled to vote under the Plan.

5.        **Class 3 – Tort Claims**

Class 3 consists of Holders of Tort Claims other than Unknown Tort Claims. The Plan establishes the Trust to resolve the Class 3 Claims. Class 3 Tort Claimants shall have their Claims treated pursuant to the Allocation Plans and such Claims will be reviewed by the Abuse Claims Reviewer. The Tort Claimants are bound by all of the injunctions in the Plan. The Honorable William L. Bettinelli will be sought to be retained as the Abuse Claims Reviewer. The Abuse Claims Reviewer will review proofs of claim filed by the Class 3 Claimants and any other information which the Abuse Claim Reviewer requests from such Claimants. The Abuse Claim Reviewer will then assign a certain number of points to the Class 3 Claimants' Tort Claims based upon various factors such as the nature of the abuse and the effect of the abuse on the survivor. Upon completion of the Abuse Claim Reviewer's review of each Class 3 Claimant's Claim, the Abuse Claim Reviewer shall provide written notification to the Trustee of the Trust of the points awarded to each Class 3 Claimant. The Trustee shall calculate the average value of each awarded point based upon the net funds in the Trust's Reserve available for distribution to the Tort Claimants who are beneficiaries of that Reserve. Under the Allocation Protocol, distributions will be made by the Trust to all Tort Allocation Claimants who are

beneficiaries of the Reserve simultaneously, except that the Trust will hold any Claims subject to an objection in reserve until such time that the objection is resolved with respect to a Claim. Upon making such determination the Trustee shall distribute the monetary award to the Class 3 Claimant in accordance with the Plan and the Trust documents. The Trust will be funded with $20,000,000.00 of which at least $12,000,000.00 shall come from the Debtor's cash and $8,000,000.00 shall be contributed by the Settling Insurer in exchange for full policy releases and other protections afforded in the Plan. The Trust will not receive any additional funding for distribution to Tort Claimants. The sole additional funding will be from the Reorganized Debtor for the fees and costs of the Trust and its professionals. The Trust will establish separate reserves for the plaintiffs in the Becker Case (<u>$ to be determined</u>), the plaintiffs in the Does Case (<u>$ to be determined</u>) and the Tort Claimants who are not part of either group (funded per capita with the average amount payable to the Becker and Does plaintiffs). A copy of the Allocation Plan is attached as **Exhibit A** to the Plan.

On the Effective Date, the Trust shall assume all liability for and will pay all Tort Claims pursuant to the provisions of the Plan and the Trust Documents. The Debtor will receive a discharge as set forth in Section XII of the Plan.

### 6. Class 4 - Unknown Tort Claims

Class 4 consists of Holders of Unknown Tort Claims. The Unknown Tort Claims Representative is responsible for negotiating the treatment of Unknown Tort Claims, including the amount of a reserve of monies to be set aside to be paid to Holders of Unknown Tort Claims. The reserve will be held by the Trust, separate and apart from the reserves for Class 3 Tort Claims and any other Entity entitled to payment or compensation by the Trust. The Plan will provide that in exchange for the funding of any Unknown Tort Claims reserve, Holders of Unknown Tort Claims will be channeled to the Unknown Tort Claims Reserve Fund and will not be entitled to pursue Claims against the Protected Parties. The Unknown Tort Claimants are bound by all of the injunctions in the Plan. Any Unknown Tort Claimant receiving payment from the Trust must execute a written release of any and all past, present and future Claims, and shall be entitled to no further payment from the Trust or the Protected Parties.

The Unknown Claims Representative has not yet completed his analysis or has issued a Report and Recommendation.

### 7. Class 5 – General Unsecured Claims

Class 5 consists of Holders of General Unsecured Claims that are not Class 2 General Unsecured Convenience Claims. These are Claims not secured by any interest in the Debtor's property and consist of any Claim against the Debtor that is not a Tort Claim, Unknown Tort Claim, Annuitant Claim, Administrative Claim, Abuse Related Contingent Claim, Penalty Claim, Priority Tax Claim, or Employment/Retirement Claim. Based upon a review of the Debtor's Schedules, as well as filed Proofs of Claim, the Debtor estimates that Class 5 Unsecured Claims total approximately $98,181.69. In addition, it is anticipated that certain Parishes will contribute to payment of certain claims as appropriate reducing the Debtor's ultimate monetary responsibility for these claims. The Plan provides that all Holders of Allowed Class 5 Claims will be paid, without interest, as soon as reasonably practicable after all Class 5

Claims have either been Allowed or Disallowed.  The Holders of Class 5 General Unsecured Claims scheduled in Exhibit D.

Nothing in the Plan modifies the obligations of any co-obligor or guarantor.

### 8.      Class 6 – Penalty Claims

These Claims are based upon a fine, penalty, forfeiture, punitive damages, or similar award not meant to compensate the Claimant for actual damages.  The Debtor is unaware of any such Penalty Claims.  It is possible that Class 4 Tort Claimants may have included some type of Penalty Claim in their proofs of claim.  The Plan provides that Penalty Claims will be subordinated to all other Allowed Claims and receive no distribution under the Plan.

### 9.      Class 7 – Employee/Retirement Claims

Class 7 consists of Holders of Claims who are employees or retirees of the Debtor.  The Plan provides that Class 7 Employee/Retirement Claims shall be paid in full as such claims are due.

### 10.      Class 8 – Abuse Related Contingent Claims

Class 8 consists of Abuse Related Contingent Claims.  These are Claims by an Entity against the Debtor for contribution, indemnity, or reimbursement arising as a result of such Entity's  liability for paying or defending against any Tort Claim, including, but not limited to, a joint tortfeasor or the like.  Consistent with Section 502(e)(1) of the Bankruptcy Code, Holders of Class 8 Claims held by any Entity shall be Disallowed and shall receive no distribution under the Plan.

### 11.      Class 9 – Oblates Claims Class

Class 9 consists of the contingent claims for contribution and indemnification against the Diocese by the Oblate Fathers Western Province, Inc. and U.S. Province of the Missionary Oblates of Mary Immaculate, Inc.  Both of these claims were filed on September 8, 2017, which date was late given the Order for General Claims Claims Bar Dates of July 31, 2017.  Holders of Class 9 claims shall be disallowed and shall receive no distribution under the Plan.

### 12.      Class 10 – Shannon Claim

Class 10 consists of the claim brought by Susan Shannon on behalf of M.S., and is for negligent supervision.  This claim was incurred in 2013.  Holders of Class 10 claims, if allowed, shall be limited to applicable insurance coverage.  Any insurance deductible to be paid by the Debtor would be allowed as a reasonable and necessary business expense.

### 13.      Class 11 – Wilcox Claim

Class 11 consists of the claim for personal injury, slip and fall of Joseph Stephen Wilcox.  This claim was incurred in 2014.  Holders of Class 11 claims, if allowed, shall be limited to

applicable insurance coverage.  Any insurance deductible to be paid by the Debtor would be allowed as a reasonable and necessary business expense.

**C.      Means for Execution of the Plan**

      **1.      Establishment of Trust**

      On the Confirmation Date, the Trust will established in accordance with the Trust Documents.  The Trust shall qualify as a Qualified Settlement Fund pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.  Omni Management Acquisition Corp. ("Omni") will be the Trustee. Omni has served as Trustee of trusts created for the benefit of Tort Claimants in the Chapter 11 Cases of Diocese of Helena, Montana, Diocese of Davenport, Society of Jesus, Oregon Province, Catholic Bishop of Northern Alaska, The Christian Brothers of Ireland, Inc. and The Christian Brothers Institute.

      **2.      Funding of Trust**

      (a)      Within ten (10) days after the Settling Insurer receive written notice from the Trustee that the Conditions to Effectiveness set forth in Section 11.1 (a), (b), and (c) have occurred, the Settling Insurer will make payments to its respective attorneys' trust accounts as follows:

      (b)      Within ten (10) days after the Settling Insurer receives written notice from the Trustee that all of the Conditions to Effectiveness set forth in Section 11.1 have occurred, the Settling Insurer shall cause its attorneys to pay to the Trust the $8,000,000.00 deposited in the attorney's trust account pursuant to Section 9.2.2.

      (c)      Debtor will fund the trust in the amount of $12,000,000.00 within ten (10) days after all the conditions to effectiveness set forth in Section 11.1 have occurred.

      **3.      Establishment of Reserve Accounts**

      As set forth in the Trust Agreement and Article IX of the Plan, the Trustee shall establish Reserves for various purposes, including the payment of the Tort Claims.

      **4.      Liquidation and Payment of Tort Claims**

      (a)      The Trust shall pay Tort Claims in accordance with the terms of the Plan, Confirmation Order and Trust Documents.

      (b)      Nothing in the Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estate or any Settling Insurer or relating to the treatment of Tort Claims, except that the Reorganized Debtor shall be liable for all fees and expenses of the Trust; or (ii) otherwise modify the rights or obligations of the Estate as otherwise set forth in the Plan.

      (c)      Effect of No Award On Tort Claims.  If a Tort Claimant is denied payment pursuant to the Allocation Plans, the Holder of such Tort Claim will have no further rights against the Trust, Trustee or the Protected Parties.

(d)     Treatment of Attorneys' Fees and Costs of Tort Claimants.  Subject to the treatment of Qualified Counsel Fees and Qualified Counsel Costs pursuant to the Plan, the fees and expenses of attorneys representing Tort Claimants who receive payment from the Trust will be borne by such Tort Claimants based on applicable state law and individual arrangements made between such Tort Claimants and their respective attorneys. The Protected Parties will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants. The Trust and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Tort Claimants, except to the extent that the Trust or the Trustee is required to make payments pursuant to the provisions relating to Qualified Counsel Fees and Qualified Counsel Costs.

(e)     Treatment of Punitive Damages.  Claims for punitive or exemplary damages in connection with any of the Tort Claims will be treated as Penalty Claims and will receive no distribution under the Plan.

(f)     Withdrawal of Tort Claims.  A Tort Claimant may withdraw the Claim at any time on written notice to the Trustee.  If withdrawn, the Claim will be withdrawn with prejudice and may not be reasserted.

(g)     Before the Trustee will pay a Tort Claim to any Tort Claimant, the Trust and the Tort Claimant must comply with Section 9.5.3 of the Plan and its subsections.

(h)     The failure by one or more Medicare Beneficiaries or other Tort Claimants to comply with Section 9.5.3 of the Plan and its subsections shall not delay or impair the payment by the Trustee to any other Medicare Beneficiary or other Tort Claimant complying with these provisions.

(i)     If the Tort Claimant is an estate of a Tort Claimant, then the letters or documentation required pursuant to Section 9.5.3.2 and 9.5.3.3 of the Plan need not be dated within 90 days of the date of payment by the Trustee to such Claimant.

## 5.     Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtor that have not been rejected by Order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor.  In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.  The contracts which will be assumed by the Debtor, shown in their total amount, are as follows:

First Lease, Inc.- cleaning equipment lease
Marlin Leasing Corporation – Toshiba Finisher lease
U.S. Post Office – postage machine lease
Regina Cleric Rentals – retired housing lease
Stites 9 Rental Units – housing lease
Stites 4 Rental Units – housing lease
Holy Cross Cemetery Caretaker House – housing lease
Copenhaver Farms Lease – farmland lease, $3,000 per year

**D.    Procedure for Determination of Claims Other than Tort Claims Based on the Sexual Abuse Proof of Claim Form.**

**1.    Objection to Claims.**

Notwithstanding the occurrence of the Effective Date and except as to any Claim that has been Allowed prior to the Effective Date or any Tort Claim, the Reorganized Debtor may object to the Allowance of any Claim against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an objection within sixty (60) days after the Effective Date.

**2.    Disputed Claims.**

Except as to any Tort Claim, no payments or other distributions will be made to Holders of Disputed Claims until such Claims are Allowed Claims pursuant to Final Order.

**3.    Treatment of Contingent Claims.**

Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.

**E.    Provisions Governing Distributions**

**1.    Distribution Only to Holders of Allowed Claims.**

Except as otherwise provided in the Plan, distributions under the Plan and the Plan Documents will be made only to the Holders of Allowed Claims and in the case of Tort Claims, only pursuant to the Plan and the Trust Documents and after delivery of appropriate releases. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any distribution otherwise provided to the Claimants under the Plan or the Plan Documents.  If necessary in determining the amount of a *pro rata* distribution due to the Holders of Allowed Claims in any Class, the Reorganized Debtor or the Trustee, as applicable, will make the *pro rata* calculation as if all Unresolved Claims were Allowed Claims in the full amount Claimed or in the Estimated Amount.  When an Unresolved Claim in any Class becomes an Allowed Claim, the Reorganized Debtor or the Trustee, as applicable, will make full or partial distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the Order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

### 2. Transmittal of Distributions.

Except as otherwise provided in the Plan, in the Plan Documents, or in an Order of the Bankruptcy Court, distributions to be made under the Plan, Confirmation Order or Trust Documents to Tort Claimants will be made by the Trustee and Distributions to all other Claimants will be made by the Reorganized Debtor. Distributions to Tort Claimants will be made (a) to the client trust account for attorneys of record of Tort Claimants, (b) if the Tort Claimant does not have an attorney of record, to the latest mailing address set forth in a Proof of Claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor or Trustee, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor or Trustee, as applicable, to the mailing address set forth in the Schedules filed by the Debtor in this Case. Distributions to other Claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the Claimant, (b) if the Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, to the mailing address set forth in the Schedules filed by the Debtor in this Case. If a Claimant's Distribution is not mailed or is returned to the Reorganized Debtor or Trustee because of the absence of a proper mailing address, the Reorganized Debtor or Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Tort Claimant on account of Distributions made to the client trust account of a Tort Claimant's attorney.

### 3. Timing of Distributions.

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a business day, such payment will instead be made on the next business day, with interest to the extent expressly contemplated by the Plan or any applicable agreement or instrument. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Trustee as undeliverable or is deemed to be an undeliverable Distribution, provide the Trustee with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtor, the Trust, the Trustee or its property. Any undeliverable Distributions that are not claimed under this Section will become available to distribute to other Claimants or be retained by the Reorganized Debtor in accordance with the Plan. Nothing in the Plan requires the Reorganized Debtor, the Trust or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable. If an instrument delivered as a Distribution to a Claimant is not negotiated within one hundred and twenty (120) days after such

instrument was sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and it shall become Available Cash.

### 4.    Form of Distributions.

Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions will be made, at the option of the Reorganized Debtor or Trustee, by a check by first class mail, postage prepaid, or wire transfer.

### 5.    No Professional Fees or Expenses.

No professional fees or expenses incurred by a Claimant will be paid by the Debtor, the Reorganized Debtor, the Province or the Trustee with respect to any Claim except as specified in the Plan or the Trust Documents.

### 6.    Claim Estimation.

In order to effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to § 502(c) of the Bankruptcy Code, estimating or limiting, on account of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation pursuant to § 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate an Tort Claim.

### 7.    No Interest on Claims.

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order or Plan Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 8.    Withholding Taxes.

The Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder

shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Reorganized Debtor may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

### 9.    No *De Minimis* Distributions.

No cash payment of less than $100 will be made by the Reorganized Debtor or the Trustee to any Holder of an Allowed Claim.  No consideration will be provided in lieu of the *de minimis* distribution that is not made under this Article.  Allowed Claims that are entitled to a *pro rata* distribution of less than $100 shall continue to accrue until such time as the *pro rata* distribution on account of such Claim will be $100 or more.

### 10.    Manner of Cash Payments.

Cash payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or, at the Trustee's option, by wire transfer from a domestic bank.  Cash payments to foreign Claimants may be paid, at the Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

## IX.

## CONDITIONS TO EFFECTIVE DATE

### A.    Conditions to Occurrence of Effective Date

The Effective Date will occur when each of the following conditions have been satisfied or waived in accordance with Section 11.1 of the Plan:

(1)    The Bankruptcy Court shall have entered a Final Order or Final Orders approving all Insurance Settlement Agreement and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to each of those parties, and no stay of such Orders is in effect;

(2)    The Bankruptcy Court shall (i) have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor, the Committee, and the Settling Insurer; and (ii) the Confirmation Order shall be a Final Order and no stay of such Order shall be in effect;

(3)    The Trustee and Reorganized Debtor have signed the Trust Agreement; and

(4)    The Debtor and the Settling Insurer has made the payment to the Trust described in Section 9.2.1 and 9.2.2 of the Plan.

**B.      Waiver of Conditions**

The Debtor, the Committee and the Settling Insurer may waive any of the conditions to the occurrence of the Effective Date.

**C.      Non-Occurrence of Effective Date**

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within ninety (90) days of entry of a Final Order, or Final Orders confirming the Plan and approving all Insurance Settlement Agreements, the Plan shall become null and void.  A statement shall be filed with the Bankruptcy Court within three (3) Business Days regarding the occurrence of the Effective Date.

**X.**

**EFFECT OF PLAN CONFIRMATION**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR THE DISCLOSURE STATEMENT, NOTHING CONTAINED IN THE PLAN SHALL CONSTITUTE A RELEASE OF ANY TORT CLAIM OR CONSTITUTE AN INJUNCTION AGAINST PROSECUTION OF A TORT CLAIM AGAINST (A)  AN ENTITY THAT BECOMES A SUCCESSOR OF THE DEBTOR AFTER THE EFFECTIVE DATE, TO THE EXTENT SUCH SUCCESSOR'S LIABILITY FOR AN ACT OR ACTS OF ABUSE, IS INDEPENDENT OF THE DEBTOR'S LIABILITY AND SUCH ENTITY IS NOT A PROTECTED PARTY AND (B) A PERPETRATOR.   THE DISCHARGE AND INJUNCTION PROVISIONS OF THE PLAN DO NOT APPLY TO (A) THE OBLIGATIONS ARISING UNDER THE INSURANCE SETTLEMENT AGREEMENT APPROVED BY THE BANKRUPTCY COURT, WHICH ARE NOT AND WILL NOT BE DISCHARGED; (B) AN ENTITY THAT BECOMES A SUCCESSOR TO THE DEBTOR AFTER THE EFFECTIVE DATE, TO THE EXTENT SUCH SUCCESSOR'S LIABILITY FOR AN ACT OR ACTS OF ABUSE IS INDEPENDENT OF THE DEBTOR'S LIABILITY AND SUCH ENTITY IS NOT A PROTECTED PARTY, WHICH ARE NOT AND WILL NOT BE DISCHARGED.  TORT CLAIMS BASED ON ABUSE THAT HAPPENED AFTER THE PETITION DATE WILL NOT BE DISCHARGED, RELEASED OR IMPAIRED, WITH THE EXCEPTION OF ANY SUCH CLAIMS AGAINST THE SETTLING INSURER.**

On the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor will be discharged from all liability for any and all Claims that arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of this Case, including all Tort Claims (except as provided in Section 12.1.1 of the Plan) and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; or (c) the holder of such Claim has accepted this Plan.  Nothing contained in this paragraph shall affect, impair or diminish the Debtor's indemnification obligations under the Insurance Settlement Agreement, which obligations are excepted from the Debtor's discharge.

## A.     Post-petition Tort Claims

Notwithstanding Section 12.1 of the Plan, Tort Claims against the Debtor based on Abuse that happened after the Petition Date will not be discharged, released or impaired.  To the extent any such Claim is against a Settling Insurer, such Claim shall be enjoined pursuant to the injunctions in Section XII of the Plan.

## B.     Vesting of Assets

In accordance with §§ 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Revested Assets shall revest in the Reorganized Debtor on the Effective Date free and clear of all Interests of any Entity, including successor liability Claims.  On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Entity, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

## C.     Continued Existence of Reorganized Debtor

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as A separate Entity in accordance with the applicable laws of the State of Montana, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501I(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

## D.     Exculpation and Limitation of Liability

**Except as expressly provided in this Plan, none of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any Claimant, any other party in interest, or any of their respective Representatives, financial advisors, or Affiliates, or any of their successors or assigns, for any act or omission in or relating to this Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the administration of the Plan or the Trust, except liability for their willful misconduct or gross negligence (provided, however, the Debtor and Reorganized Debtor will be discharged from any such liability for such acts or omissions occurring prior to the Effective Date) and in all respects, such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Case.  Without limiting the generality of the foregoing, the Debtor and its members, financial advisors, and other professionals shall be entitled to and granted the benefits of § 1125(e) of the Bankruptcy Code.**

**The Catholic Mutual Parties, the Reorganized Debtor, the Trust, the Trustee and professionals employed by the foregoing shall not have any liability to any Entity, including any governmental entity or insurer, on account of payments made to a Tort Claimant,**

including any liability under the Medicare Secondary Payer Act.

E.      **Channeling Injunction**

In consideration of the undertakings of the Protected Parties pursuant to their respective settlements with the Debtor, the funding of the Trust, and other consideration, and to further preserve and promote the agreements between and among the Protected Parties and the protections afforded the Protected Parties and pursuant to Section 105 of the Bankruptcy Code:

(a)      any and all Channeled Claims, are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts as established under the Plan and the Trust Documents as the sole and exclusive remedy for all holders of Channeled Claims; and

(b)      all Entities who have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against any of the Protected Parties, including:

(i)      commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or against the property of any of the Protected Parties;

(ii)      enforcing, attaching, collecting or recovering, by any manner or means, from any Protected Parties, or from the property of any Protected Parties, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Protected Parties;

(iii)      creating, perfecting or enforcing any lien of any kind against any Protected Parties, or the property of any Protected Parties with respect to any such Channeled Claim; and

(iv)      asserting, implementing or effectuating any Channeled Claim of any kind against:

(1)      any obligation due any Protected Parties;

(2)      any Protected  Parties; or

(3)      the property of any Protected Parties.

(v)      taking any act, in any manner, in any place whatsoever that does not conform to, or comply with, the provisions of the Plan; and

(vi)      asserting or accomplishing any setoff, right of indemnity, subrogation,

contribution, or recoupment of any kind against any obligation due any of the Protected Parties or the property of the Protected Parties.

**F.     Supplemental Injunction Preventing Prosecution Of Claims Against Settling Insurers**

Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and in consideration of the undertakings of Catholic Mutual pursuant to Catholic Mutual Settlement and this Plan, any and all Entities who have held, now hold or who may in the future hold any Interests (including all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Tort Claimants, Unknown Tort Claimants, Diocese Parties, Perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Catholic Mutual Settlement) against any of the Protected Parties, Covered Entity, or the Certificates, which, directly or indirectly, relate to, any of the Certificates, any Tort Claims or any Related Insurance Claims, are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Catholic Mutual Parties, Covered Entity, and/or the Certificates, including:

(a)     Commencing or continuing in any manner any action or other proceeding against Catholic Mutual or the Covered Entity or the property of the Catholic Mutual Parties or the Covered Entity;

(b)     Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree or order against the Catholic Mutual Parties or the Covered Entity or the property of the Catholic Mutual Parties or the Covered Entity;

(c)     Creating, perfecting, or enforcing any lien of any kind against the Catholic Mutual Parties or the Covered Entity or the property of the Catholic Mutual Parties or the Covered Entity

(d)     Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due the Catholic Mutual Parties or the Covered Entity or the property of the Catholic Mutual Parties or the Covered Entity; and,

(e) Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

**G.     Insurance Settlement Agreement Injunctions**

Any injunction contained in the Insurance Settlement Agreement is incorporated into the Plan by reference, is deemed fully set forth in this Plan, is approved and is in addition to the injunctions expressly set forth in this Plan.

**H.     Term of Injunctions or Stays and Confirmation of Settlements With Settling Insurers**

On the Effective Date, the injunctions provided for in this Plan, including the Channeling Injunction and the Supplemental Injunction shall be deemed issued, entered, valid and enforceable according to their terms and shall be permanent and irrevocable.  All injunctions and/or stays provided for in this Plan, the injunctive provisions of Sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting Catholic Mutual, are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified.

**I.     Limitation of Injunction and Discharge**

Notwithstanding any provision of this Plan, the foregoing injunctions and discharge preventing prosecution of Tort Claims against Protected Parties provides absolutely no protection to a Perpetrator.

**J.     Debtor Waiver and Release of Claims Against Settling Insurer**

In consideration  of the contributions paid and other consideration to be provided by the Settling Insurer and the Debtor irrevocably and unconditionally, without limitation, shall release, acquit, and forever discharge the Settling Insurer from any and all Claims and/or Causes of Action against any Settling Insurer, or the property thereof.

## XI.

## NON-MONETARY COMMITMENTS

In order to further promote healing and reconciliation, and in order to continue the Debtor's efforts to prevent sexual abuse from occurring in the Diocese of Great Falls--Billings, the Debtor and Reorganized Debtor agree to non-monetary undertakings described in Exhibit F to the Plan.

## XII.

## CERTAIN OTHER GENERAL PROVISIONS OF THE PLAN

The Plan contains other provisions consistent with the requirements of Chapter 11 of the Bankruptcy Code as set forth below:

1.      **Causes of Action/Avoidance Actions**

Except as otherwise provided in the Plan, the Reorganized Debtor shall retain and exclusively enforce the Debtor's Causes of Action, whether arising before or after the Petition Date, in any Court or other tribunal, including without limitation, an adversary proceeding filed in this Case.

2.      **Retention of Jurisdiction**

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date:

Except as otherwise set forth in the Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with the Plan, including, but not limited to, the following:

a)      The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

b)      The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

c)      The granting of relief in aid of this Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Protected Parties from actions prohibited under this Plan or the Plan Documents;

d)      Amendments to and modifications of this Plan;

e)      Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date and;

f)      Enforcement of the releases, Channeling Injunction and Supplemental Injunction issued under the Plan, Confirmation Order, and Non-Monetary Commitments; and

g)      The closing of this Case.

3.      **Remand of Removed Actions**

On the Effective Date, all actions removed by the Debtor or any other Co-Defendant during this Case shall be remanded to the court from which they were removed and can continue against the Debtor and any other Entity who is not a Protected Party, only to the extent set forth in the Plan.  Any party to the removed action may submit an order, with notice only to the other parties to the removed action, providing for remand of the action.

### 4. Modification of the Plan

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend, modify or withdraw this Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtor may, upon order, amend or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### 5. Severability

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of the Debtor, in which case the term or provision may be unilaterally withdrawn by the Debtor. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Article, is valid and enforceable under its terms. In the event of a successful collateral attack on any provision of the Plan (*i.e.*, an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of the Plan will remain binding on the Debtor, the Reorganized Debtor, the Settling Insurer, the Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

### 6. Section 1146 Exemption

Pursuant to Bankruptcy Code Section 1146(c) any transfer of property pursuant to the Plan will not be subject to any document, recording tax, stamp tax, or similar tax, mortgage tax, real estate transfer tax, or other governmental assessment in the United States, and the Confirmation Order will direct the appropriate state or local governmental officials and/or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 7. Management of the Reorganized Debtor

The Reorganized Debtor shall continue to be managed by current management. Most of these individuals have been involved in the Debtor's affairs for many years and are well suited to continue the Debtor's mission. Those managers, their titles and salaries consist of:

> Bishop Michael W. Warfel, salary $31,467
> Vicar General Jay Peterson, salary $31,628
> Chancellor Darren Eultgen, salary $66,040
> Richard Moog - Financial Officer, salary $92,269

### 8.     Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon their members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses pursuant to § 503(b) of the Bankruptcy Code for making a substantial contribution in the Chapter 11 Case.

## XIII.

## CONFIRMATION PROCEDURES

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code §1129 must be met.   This includes, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the best interests of Holders of Claims in each impaired Class.

### A.     Solicitation of Votes; Acceptance

The Debtor is soliciting the acceptance of the Plan from all Holders of Claims in Classes that are impaired under the Plan and receiving Distributions thereunder.   Using this criteria, Holders of only Claims in Classes 3, 4 and 5 are entitled to vote on the Plan.   In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured or made in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Classes 1, 2 and 7 will be deemed to have accepted the Plan if the Plan is accepted by Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims in that Class that has cast Ballots on the Plan and that are eligible to vote for or against the Plan. The Debtor may file a motion to estimate each Class 3 Claim at $1.00 each for voting purposes only.   The actual amount payable to Holders of Allowed Class 3 Claims will exceed $1.00. This is consistent with the procedure followed in other mass tort bankruptcy cases and the Tort Proof of Claim forms intentionally did not provide for a dollar amount for the Claims as the Claims are unliquidated tort claims.

### B.     Confirmation Hearing

Bankruptcy Code §1128(a) requires the Bankruptcy Court, after notice, to hold the **Confirmation Hearing** after the period for submission of Ballots has expired.     The Confirmation Hearing may be postponed from time to time by the Bankruptcy Court without further notice except for an announcement of the postponement made at the Confirmation Hearing.   Bankruptcy Code § 1128(b) provides that any party in interest may object to

confirmation of the Plan.  Objections must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.  Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable Jim D. Pappas, and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement on or before the time and date designated in such Order and Notice. **FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code Section 1129 have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable.

5.      The Debtor has disclosed the identity and affiliations of all individuals proposed to serve, after confirmation, as directors or officers of the Debtor and the appointment to or continuance in such positions by those individuals is consistent with the interests of creditors and with public policy; and (b) the Debtor has disclosed the identities of any insider(s) that will be employed or retained by the Reorganized Debtor and the nature of any proposed compensation for such insider(s).

6.      Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See "Best Interests of Creditors Test" below.

7.      Unless the Debtor is required to seek nonconsensual confirmation of the Plan, each Class of Claims has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the Holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the Effective Date, or the date the Claim is Allowed; (b) other Priority Claims will be paid in full on the Effective Date; and (c) Priority Tax Claims will receive payment in full plus interest over five (5) years.

9.      At least one impaired Class has accepted the Plan, determined without including any

acceptance of the Plan by any insider holding a Claim in such Class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation of or the need for further financial reorganization by the Debtor or the Reorganized Debtor.

11.     The Debtor believes that the Plan has been submitted in good faith and that, upon acceptance of the Plan by the voting Class, the Plan will satisfy all of the foregoing statutory requirements.

## C.     Best Interests of Creditors Test

As mentioned above, confirmation of the Plan requires that each Holder of a Claim in an impaired Class must either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor believes that in a hypothetical liquidation all creditors will receive less than they will likely receive under the Plan.  Chapter 7 liquidation carries potential costs and risks that are resolved through the Plan, as follows:

1.     The Plan incorporates the Allocation Plans, which were negotiated by counsel representing in excess of 75% of Tort Claimants.  There is likelihood that a Chapter 7 Trustee will be unable to implement the Allocation Plans or a similar Plan in the absence of a confirmed Chapter 11 Plan.  As such, substantial estate resources would likely be expended adjudicating or analyzing Tort Claims in a Chapter 7 case.

2.     A Chapter 7 Trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest, excluding the Debtor, pursuant to 11 U.S.C. § 326.  Any such payment would dilute the amount of funds available to pay creditors.

3.     The Settling Insurer would not get the Channeling Injunction and/or releases provided in the Plan, nor would they make the substantial contributions they are making under the Plan without such injunctions and/or releases.

In addition, it is unlikely that the Settling Insurer would voluntarily contribute without the corresponding benefit of final resolution of Tort Claims.  Annexed hereto as **Exhibit C** is a Liquidation Analysis.  The Liquidation Analysis indicates that in a liquidation, Holders of Unsecured Claims would receive a lesser distribution than provided under the Plan.

## D.     Feasibility

The Bankruptcy Code requires that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization.  Because (i) all the Tort Claims will be resolved pursuant to the Plan, (ii) the Reorganized Debtor will not be financially liable on account of any Tort Claims that occurred prior to the Petition Date except as provided in the Plan, and (iii) distributions will be made only to the extent of existing assets or future recoveries, the Reorganized Debtor and the Debtor believes the Plan is feasible.

### E.     Cram Down

The Bankruptcy Code provides a mechanism by which a Plan may be confirmed even if it has been rejected by an impaired Class of Claims.  Under the "cram down" provisions of the Bankruptcy Code (§1129(b)), the proponent of the Plan (in this case the Debtor) may request that it be confirmed despite its rejection by an impaired Class, and the court will confirm the Plan if it (i) does not discriminate unfairly against a dissenting impaired Class and (ii) is fair and equitable with respect to such Class.

The Bankruptcy Code sets forth specific guidelines for determining whether a Plan is fair and equitable with respect to a particular Class of Claims.  For unsecured Claims, as are those in Classes 2, 3, 4 and 5, a Plan must provide that equity interest Holders do not receive or retain any property on account of their interest.  The Debtor submits that this test which is applied to traditional corporations is inapplicable to not-for-profit corporations as there are no equity interests or junior creditors or the Holders of Claims that are junior to Claims of a non-accepting Class are not receiving any property under the Plan.

In the event the Bankruptcy Court refuses to impose a "cram down" on the rights of a non-consenting Class unless certain modifications are made to the terms and conditions of such non-consenting Class' treatment under the Plan, Debtor reserves the right, without re-solicitation, to propose such modification to such non-consenting Class' treatment and to confirm the Plan.

## XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated numerous alternatives to the Plan, including, without limitation, proposing competing Plans by the Debtor and the Committee, and the conversion of the Case to Case under Chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtor by a Chapter 7 Trustee.  After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries of Holders of Claims.  The following discussion provides a summary of the analysis of the Debtor supporting its conclusion that a Chapter 7 liquidation of the Debtor or an alternative Chapter 11 Plan for the Debtor will not provide higher value to Holders of Claims.

### A.     Liquidation Under Chapter 7 of the Bankruptcy Code

If no Chapter 11 Plan can be confirmed, the Case of the Debtor may be converted to a case under Chapter 7 (assuming the Debtor consents), in which event a Trustee would be elected or appointed to liquidate the Debtor's assets for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  In addition to the factors discussed above, the Debtor believes that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Trustee for bankruptcy and professional advisors to such Trustee and (2) the erosion in value of assets in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" environment in which such a liquidation would likely occur.  Accordingly, the Debtor has determined that confirmation

of the Plan will provide each Holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under Chapter 7.

A discussion of the effects that a Chapter 7 liquidation would have on the Holders of Claims is set out in the Liquidation Analysis, attached as **Exhibit C** hereto.

## B.      Alternative Chapter 11 Plans

If the Plan is not confirmed, any other party in interest could undertake to formulate a different Chapter 11 Plan.  Such a Chapter 11 Plan might involve either a reorganization and continuation of the business of the Debtor or an orderly liquidation of the properties and interests in property of the Debtor.  With respect to an alternative Chapter 11 Plan, the Debtor has examined various other alternatives in connection with the process involved in the formulation and development of the Plan.  The Debtor believes that the Plan, as described herein, enables Holders of Claims to realize the best recoveries under the present circumstances.

## XV.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in this Case.

## A.      The Trust

The Trust is a "qualified settlement fund" ("**QSF**") within the meaning Treasury Regulations enacted under the Internal Revenue Code at 26 U.S.C. § 468B(g).  The Trust is characterized as a QSF because:

1.      The Trust is established pursuant to an Order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2.      The Trust is established to resolve or satisfy one or more contested or uncontested claims that has resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law related to sexual abuse (but excluding non-tort obligations of the Debtor to make

payments to its general trade creditors or debt holders that relate to: a case under Title 11 of the United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and,

3.      The Trust is a trust under state law.

The primary tax consequences of the Trust being characterized as a QSF are the following:

1.      The Trust must use a calendar taxable year and the accrual method of accounting.

2.      If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

3.      The Trust takes a fair market value basis in property contributed to it by the Debtor.

4.      The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and Estate (currently 35%). The Debtor's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

5.      The Trust may deduct from its gross income a limited number of administrative expenses; the Trust in not entitled to deduct distributions paid to its beneficiaries.

6.      The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to Claimants.

## B.      Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on its particular tax situations.

Among other things, the federal income tax consequences of a Distribution to a Claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a Distribution in repayment of the principal amount of a loan is generally not

included in the Claimant's gross income.  Distributions to Tort Claimants may not be taxable as it may be considered compensation for personal injuries.

The federal income tax consequences of a Distribution to a Claimant may also depend on whether the item to which the Distribution relates has previously been included in the Claimant's gross income or has previously been subject to a loss or bad debt deduction.  For example, if a Distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the Distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss.  Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the Distribution in income when received.

A Claimant receiving a Distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim.  For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  This income or loss may be ordinary income or loss if the Distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Claimant's trade or business for the performance of services or for the sale of goods or merchandise.  In addition, if a Claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the Claimant as a result of receiving a Distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Claimant's hands.

## XVI.

## VOTING INSTRUCTIONS

Solicitation Packages which will include copies of (i) the Disclosure Statement Approval Order, (ii) the Notice of Disclosure Statement Approval and Confirmation Hearing, (iii) the approved Form of Disclosure Statement (together with the Plan annexed thereto), and (iv) the form of Ballot shall be sent to creditors.  Procedures and deadlines for submitting the Ballot shall be included in such Solicitation Package.

--Rest of Page Intentionally Left Blank--

## XVII.

### CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative. Accordingly, the Debtor urges Holders of Claims to vote to accept the Plan by so indicating on its Ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Dated: May 30, 2018

**THE ROMAN CATHOLIC BISHOP OF
GREAT FALLS, MONTANA.**
*Debtor and Debtor-in-Possession*

By: _Michael W Warfel_
Most Reverend
Bishop Michael W. Warfel

**ELSAESSER ANDERSON, CHTD.**

_Bruce Anderson_
Ford Elsaesser, Esq.
Bruce Anderson, Esq.
Katie Elsaesser, Esq.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID 83815

Attorneys for The Roman Catholic Bishop
of Great Falls, Montana